# ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* RICHARD STEPHEN KAHN

[Misc. (BV) No. 15, September Term, 1979.]

*Decided July 15, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Joseph F. Murphy, Jr.,* for respondent.

*Walter D. Murphy, Jr., Assistant Bar Counsel,* for petitioner.

MURPHY, C. J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion at page 684 *infra,* in which COLE and DAVIDSON, JJ., concur.

The Attorney Grievance Commission, acting through Bar Counsel, filed a Petition for Disciplinary Action against Richard Stephen Kahn, alleging violations of the following provisions of the Disciplinary Rules of the Code of Professional Responsibility:

"DR 1-102 Misconduct.

(A) A lawyer shall not:

    (1) Violate a Disciplinary Rule.

* * *

    (3) Engage in illegal conduct involving moral turpitude.

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

    (5) Engage in conduct that is prejudicial to the administration of justice.

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

"DR 1-103 Disclosure of Information to Authorities.

(A) A lawyer possessing unprivileged knowledge of a violation of DR 1-102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

"DR 2-103 Recommendation of Professional Employment.

* * *

(B) A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer.

(C) A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2-103 (E).

(D) A lawyer shall not request a person or organization to recommend or promote the use of his services or those of his partner or associate, or any

other lawyer affiliated with him or his firm, as a private practitioner, except that:

(1) He may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association and may pay its fees incident thereto.

(2) He may cooperate with the legal services of any of the offices or organizations enumerated in DR 2-103 (E) (1) through (4) and may perform legal services for those to whom he was recommended by it to do such work if:

(a) The person to whom the recommendation is made is a member or beneficiary of such office or organization; and

(b) The lawyer remains free to exercise his independent professional judgment on behalf of this client.

"DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

\* \* \*

(3) Neglect a legal matter entrusted to him.

"DR 7-101 Representing a Client Zealously.

(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101 (B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7-102 (B).

"DR 7-102 Representing a Client Within the Bounds of the Law.

(A) In his representation of a client, a lawyer shall not:

\* \* \*

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

"DR 9-102 Preserving Identity of Funds and Property of a Client.

\* \* \*

(B) A lawyer shall:

\* \* \*

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

## A.

We referred the matter, pursuant to Maryland Rule BV9 b, to J. Harold Grady, the Chief Judge of the Supreme Bench of Baltimore City, to make Findings of Fact and Conclusions of Law. After conducting an extensive evidentiary hearing, Judge Grady filed detailed findings and conclusions as follows:

"Respondent was admitted to the practice of law in the State of Maryland in 1969. He first was employed in the offices of other attorneys until early 1972 when he started out on his own. In the fall of 1972 he learned that Morris S. Berman, Esquire, was leaving a law firm with which he had been associated for several years in order to establish his own firm specializing in the handling of personal injury cases. Respondent reached agreement with Berman and joined him as an associate on a salary plus one-half of whatever business Respondent produced. At that time Berman had one other associate, Sheila Robin, Esquire, and several clerical and secretarial personnel. During the time Respondent was with Berman other associate attorneys were employed for varying periods. Within a short time Respondent became Berman's principal associate with authority to draw checks on the office escrow bank account, charge business expenses on Berman's credit cards and generally take charge of the office when Berman was absent due to illness or vacation.

"While Respondent did some trial work, most of his time was occupied with preparation of personal injury claims for presentation to insurers for purpose of settlement. There were several hundred open cases in Berman's office at all times, probably in excess of one thousand. Respondent testified that at times he would see as many as fifty or sixty office files in one day and that many form letters were sent out over his signature which he never saw. At first all of the actual settlement discussions with insurers were conducted by Berman as were the final settlements with clients, but at the end of their association Respondent also handled these

final steps in settlement. Respondent at no time had more than about a dozen of his own cases.

"Early in 1974, Respondent learned that Berman was under investigation by federal authorities for submitting false claims to insurers. In the summer of 1974 Berman entered a plea of guilty in the U. S. District Court to a charge of mail fraud and submitted his resignation from the practice of law. Respondent thought that Berman was going to turn over his law practice to Respondent but no financial terms were agreed upon. On November 8, 1974, the Court of Appeals of Maryland accepted Berman's resignation with prejudice.

"Shortly before Thanksgiving, 1974, Berman and Respondent had a violent argument over the method of Respondent's taking over Berman's practice. On the Wednesday night before Thanksgiving, Respondent and another associate in Berman's office, L. Paul Snyder, Jr., Esquire, took many office records from Berman's office to another location in the same building which Respondent and Snyder had rented. Respondent testified that these records were taken and photocopied by him in order to inventory and evaluate the open cases in the office as a basis for a financial settlement with Berman for the transfer of the practice. Such a settlement never came about. From that time on Berman has accused Respondent of all sorts of wrongdoing.

"Morris S. Berman testified that he was admitted to practice law in Maryland in November, 1961 and began active in June, 1963. He became associated with other attorneys in general trial practice and over several years acquired many clients of his own. In 1972 he suffered a heart attack and upon recovery decided to open his own offices which he did in late summer 1972. Within a short time he employed Respondent and from time to time several other associates along with necessary office personnel.

"Approximately 80% of Berman's practice consisted of automobile tort cases in which he represented plaintiffs, most of whom allegedly had soft tissue injuries. From 25% to 40% of these cases were directed to him by runners to whom

he made cash payments. During the course of his representation of these clients he frequently loaned cash sums to the clients upon their request. Berman utilized a system he described as double checking in order to recoup the cash which he had paid runners or loaned clients. The vast majority of these cases were settled without trial. In order to justify the settlement of these claims he secured the collaboration of certain doctors to whom he referred clients. In many cases these doctors submitted false medical reports and medical bills falsifying the number of treatments rendered which false reports and bills Berman submitted to insurance companies in aid of settlement. Pursuant to this scheme, after settlement Berman would not forward to the doctors the full amounts claimed by them but would retain part of the stated medical expenses for himself. Berman testified that the Respondent knew of his arrangements with runners and with the doctors who submitted false medical information and that Respondent participated in these practices.

"In February, 1974 Berman was notified by U.S. Postal Inspectors that he was under investigation for mail fraud. Sometime thereafter he was indicted in the U. S. District Court for the District of Maryland. His recollection is that during the summer of 1974, he entered a plea of guilty to one count of mail fraud. At various times he also testified either before a Grand Jury or at trial against some of the doctors from whom he had accepted false medical reports. During the late summer of 1974, he and Respondent discussed Respondent's taking over pending cases but never reached a final financial agreement. On November 8, 1974, an order was entered by the Court of Appeals of Maryland striking Berman from the rolls of those permitted to practice law in Maryland. Soon after Thanksgiving 1974, Berman learned that Respondent had moved to another office taking with him a great number of Berman's records. Berman contends that Respondent by use of these records solicited Berman's former clients and took over many cases without any payment to Berman. Thereafter Berman filed complaints against Respondent with the Bar Associations and also

sought unsuccessfully to have Respondent prosecuted by both federal and state prosecutors. In June of 1976 Berman was sentenced by the U. S. District Court to a term of three years, two and one-half of which were suspended, six months of which he served.

"Petitioner presented the testimony of the following witnesses:

> Morris S. Berman
> George L. McGill
> L. Paul Snyder, Jr., Esquire
> Joseph W. Cook
> Harold I. Glaser, Esquire
> Harry Street
> Maureen Ferrara
> Joseph Somerville
> Beverly Ann Benner, deceased, who testified before Inquiry Panel on October 19, 1975 (see Commission Exhibits 25 and 26).

"Respondent presented testimony of the following witnesses:

> William W. Cahill, Jr., Esquire
> Henry W. Prodoehl
> Virginia Zeller
> Archibald Eccleston III, Esquire
> Walter E. Black, Jr., Esquire
> Mark G. Loeb
> Benjamin Cardin, Esquire
> Ronald J. Wiley
> Richard S. Kahn, Esquire, Respondent

### "1. PAYMENT OF RUNNERS

"Morris S. Berman testified that for several years before his disbarment in November, 1974, he paid cab drivers and other people to bring negligence cases into his office. Of the many hundreds of open cases in his office at all times, he estimated 25% to 40% were brought to him by these runners. Berman's secretary, Beverly Ann Benner, testified that she

knew about fifteen people as the 'main ones.' When a runner brought a potential client to the office an interview was conducted to ascertain the likelihood of recovery and the probable extent of the recoverable damages. Depending on this evaluation, the runner would be paid in cash an amount up to $75.00 from a substantial amount of cash kept in the office safe, to which Berman, the Respondent, and Mrs. Benner had the only keys. Berman stated that after Respondent had been in his office several months he explained the situation about the runners to Respondent at which time Respondent expressed no surprise or unwillingness to participate in that practice. Thereafter Berman saw various runners frequently in Respondent's office and it was not uncommon for Respondent to get money from Berman to pay them. When Berman was on vacation or absent from the office, which was customarily at least one day per week, Respondent would conduct the entire operation. Berman testified that by the middle of 1973, he became aware that Respondent had his own runners bringing cases directly to him, but Berman was unable to give the names of those people.

"Mrs. Benner's testimony was in general the same as Berman's on the subject of runners. She named four people whom she had seen Respondent pay, including Joseph Somerville. She also believed Respondent had his own runners but was unable to name anyone and had never seen Respondent make payments to any such person.

"Maureen Ferrar, a secretary in Berman's office, testified that she knew several men as runners, one of whom was Joseph Somerville and recalled seeing Respondent accompany runners about a dozen times into the room where the cash was kept. She actually saw Respondent pay cash to Somerville only one time.

"Joseph Somerville, a self-employed taxi cab driver, testified that for several years he made a practice of soliciting people involved in automobile accidents to go to Berman's office for representation and would take them there. If the people were accepted as clients, Somerville would receive $75.00 per client in cash from the office safe.

This was a weekly occurrence on the average. After Respondent joined Berman's office, Somerville dealt directly with Respondent in Berman's absence and received cash payments from Respondent on several occasions.

"Respondent testified that within a short time after becoming associated with Berman he realized that Berman was paying people to bring cases into the office and over a period of time got to know three or four of them. He realized that this was wrong and sought other employment but without success. He first paid Joseph Somerville for bringing clients to the office when Berman was not present. He stated that Berman told him over the telephone to go to the office safe and pay cash to Somerville or else he was through. He knew it was wrong but he did it. Thereafter he made similar payments to Somerville perhaps five or six times at Berman's direction, feeling intimidated by Berman. Respondent denied making payments to any runner other than Somerville and denied having his own runners who brought cases directly to him.

### "Finding of Fact

"During 1973 and 1974 Respondent participated in the practice of making cash payments to runners for bringing potential clients to the law offices of Morris S. Berman where Respondent was an associate. The court finds that Respondent's personal involvement with Berman's runners was more extensive than he admitted in his testimony and was not confined to a few payments to Joseph Somerville. Respondent continued his association with Berman for more than a year and a half after becoming aware of the practice and made no effort to report what he knew to any authority. His explanation that he continued this practice because he was unable to find other employment is unacceptable. The court finds that Petitioner failed to prove that Respondent employed his own runners to bring cases directly to him.

### "Conclusion of Law

"By this conduct, Respondent violated DR 2-103 (B), (C) and (D); DR 1-102 (A) (1), (4), (5) and (6) and DR 1-103 (A).

## "2. CONCEALMENT OF PAYMENTS TO RUNNERS — DOUBLE CHECKING

"Morris S. Berman testified that to maintain a supply of cash from which payments could be made to runners or loans to clients, he resorted to what he called double checking. When a case was settled and the insurer's check was received, the full settlement check was deposited in Berman's escrow account. The client was asked to place his endorsement on the back of two blank checks drawn on Berman's escrow account made payable to the client. Berman then would fill in the front of one check with the amount which the client actually received. The second check would be filled in with the amount paid a runner or advanced to the client as a loan. As many of his clients preferred payment in cash, Berman would cash both checks, already endorsed by the client. The client was paid what he was to receive from the first check and Berman would keep the cash from the second check. Ostensibly the client had received the proceeds from both checks as they were both made payable to the client, whereas in fact Berman had recouped cash he had improperly advanced. In cases where Berman had submitted falsely inflated medical expenses (discussed infra), he would list for the client as an expense the full amount supposedly to be paid to the doctor. In fact Berman would not pay the full amount of the medical bills to the doctor. Instead he would ostensibly increase the client's share of the settlement by the amount of the second of the double checks, which was converted to cash and kept by Berman.

"Berman testified that he informed Respondent of this practice within a few months after their association and that Respondent used the system. Mrs. Benner testified that she was thoroughly familiar with the double checking which occurred at time of settlement and that Respondent used the system when he conducted a settlement. Respondent denied any knowledge of double checking stating that he first learned of it in 1975 after he had left Berman.

"Berman stated that Commission Exhibits 1, 2 and 3 represented a typical case of double checking. These exhibits are three checks drawn by Respondent on Berman's escrow account dated March 6, 1974, endorsed on the back by a client named George L. McGill. The front of Commission Exhibit 1 is in the handwriting of the Respondent made payable to George L. McGill in the amount of $451.00. The front of Commission Exhibit 3 is also in Respondent's handwriting made payable to George L. McGill in the amount of $25.00. Commission Exhibit 2 made payable to George L. McGill is not completed with reference to amount or drawer's signature. These exhibits according to the testimony of Berman indicated that McGill received by way of Commission Exhibit 1, $451.00 as his share of the settlement. Commission Exhibit 3 was cashed and $25.00 was kept for reimbursement of monies previously paid out in connection with McGill's case. Commission Exhibit 2, the blank check, was not utilized. Although Respondent identified his handwriting on the checks, he was unable to give any explanation for their existence but denied that it was part of a double checking scheme. McGill also had no specific recollection of Exhibits 1, 2 and 3, but conceded that Exhibit 3 possibly could represent payment by him to Respondent for legal services previously rendered. Even if this were the case, Respondent still used double checks in order to receive cash from McGill without any record of payment to him, as on its fact Exhibit 3 represented money received by McGill rather than Respondent.

## "Finding of Fact

"The court finds that Respondent knew of the practice of double checking and utilized it during the settlement of cases with clients.

## "Conclusion of Law

"By this conduct Respondent violated DR 1-102 (A) (4) and DR 9-102 (B) (3).

## "3. USE OF FALSE MEDICAL REPORTS AND BILLS

"The testimony of Morris S. Berman relating to the use of false medical evidence is set forth in INTRODUCTION, supra. Mrs. Benner testified that in doing the clerical work for settlements she knew that Berman in many cases did not remit to the doctors the full amount stated in their bills as he knew that the doctors' bill did not represent the true value of the doctors' services. Instead he cut the doctors' bills and obtained in cash, by double checking, the amount by which he had cut the bills. She testified that when Respondent handled some settlements he also would cut the doctors' bills, in some cases more than Berman would have done.

### "The Case of Harry Street

"Commission witness Harry Street testified to the following effect. In December, 1972 he was a passenger in an automobile driven by Raymond Murray, Jr., when the Murray car was hit from the rear. He went to Sinai Hospital where he was examined and sent home. The next day Murray and another man whom he did not know picked him up at his house and took him to the law offices of Morris S. Berman. There he met the Respondent who obtained from him the details of his accident. He had suffered no injuries and was not in pain at any time after the accident but cannot specifically recall whether he gave this information to the Respondent. He was directed by the Respondent to go to the office of Dr. Stuart Perkel. He went to Dr. Perkel's office 'a couple of times' but each time there were so many patients that he never did wait to see the doctor. At some later date he was contacted by the Respondent who asked if he had seen Dr. Perkel. When he told Respondent that he had not done so, Respondent directed him to another doctor's office. He was unable to name this doctor but described the location as being the office of Dr. Melvin P. Sobkov on Park Heights Avenue. He was examined by Dr. Sobkov on his first visit but never returned for any subsequent treatment. Some time thereafter he received a letter from Respondent stating

that his case had been settled, whereupon he went to Berman's office and was given a check for $450.00. The amount of the settlement was to have been $500.00 but Respondent retained $50.00 which previously had been advanced to him by Respondent in cash.

"In corroboration of Street's testimony Commission submitted Exhibits 5A through 5F taken from Berman's office file concerning the Street case. Exhibit 5D is a Negligence Information form filled out by Repondent at time of initial interview on December 2, 1972. Exhibits 5E and 5F are carbon copies made when form letters were filled in showing only date, addressee, name, address and telephone number of client, date of accident, Berman's office file number and typed name of sender. Berman testified that Commission Exhibit 6B is a sample of the form letter and that Exhibits 5E and 5F were made when form letters such as Exhibit 6B were filled in with reference to Street. Exhibit 5F is a letter dated December 4, 1972, referring Street to Dr. Stuart Perkel for treatment for accident of December 1, 1972, and requesting that the doctor forward medical information upon completion of treatment. The typed name over which signature would appear is that of Respondent. Exhibit 5A is a note, not in Respondent's handwriting, signed 'Mary' stating that two letters had been sent to Street instructing him to go to Dr. Perkel but that Dr. Perkel had no record of Street as a patient. Exhibit 5B is a carbon copy of a note in the handwriting of Respondent addressed to Street stating that his case has been settled and requesting Street to be in Respondent's office on July 10, 1973. Exhibit 5E is a carbon copy of portions of a form letter, dated July 12, 1973, referring Street to Dr. Melvin Sobkov, showing the date of the accident to be December 1, 1972, over typed name of Respondent. Exhibit 5C is a report of Dr. Sobkov dated February 28, 1973, addressed to Respondent concerning the treatment of Street showing the date of accident to be December 1, 1972, and the date of examination by Dr. Sobkov to be December 2, 1972. With the report is Dr. Sobkov's bill showing that Street received twenty-one physical therapy treatments in December, 1972, and January and

February, 1973, the total charge being $315.00. These Exhibits clearly establish that since Street was referred to Dr. Sobkov for the first time in July, 1973, Dr. Sobkov's report that he had examined Street on December 2, 1972, and treated him until February 27, 1973, was false both as to its date and its contents. Dr. Sobkov's fraudulent report and bill was forwarded by Berman to Allstate Insurance Company as proof of damages in support of Street's claim.

"Respondent testified that although Exhibits 5E and 5F bore his name as sender, he had no recollection of these papers and that most likely the letters had been sent to Dr. Perkel and Dr. Sobkov by secretaries without his actual signature. He stated that he does not recall seeing the Sobkov report, Exhibit 5C, but that most likely when it came to him, he did not have time to review all of the correspondence in the file but simply compiled what was necessary for settlement discussion and turned the file over to Berman who would deal with the insurer. Respondent concedes that an examination of the file would have revealed that Dr. Sobkov's report was fraudulently back-dated but that he had not knowingly used the false report.

## "The Case of Charles E. Crawford

"The evidence with reference to the Crawford matter consisted of the testimony of Morris S. Berman and a series of papers from his office file introduced as Commission Exhibit 4A through 4G. Crawford did not appear as a witness. Exhibit 4C is a Negligence Information Form filled out by Beverly Benner at the time Crawford was first interviewed on November 2, 1972, stating the date of the accident to be October 30, 1972. Crawford was referred, probably by Mrs. Benner, to Dr. Melvin Sobkov for treatment. Exhibit 4F is a letter from Government Employees Insurance Company dated December 26, 1972, addressed to Respondent stating that no medical reports have been received by the insurer in the Crawford case. Exhibit 4A is a carbon copy of a note dated January 23, 1973, in the handwriting of the Respondent addressed to Dr.

Sobkov referring to the case of Charles Crawford, D/A 10/31/72, stating that the client had never come to see the doctor but that he would make an immediate appointment. The note includes, 'Please note above D/A.' The evidence is clear that D/A means date of accident. Exhibit 4B is an undated report and a bill dated February 26, 1973, from Dr. Sobkov stating that Crawford had been examined in his office on October 31, 1972, and thereafter had been rendered twenty-seven physical therapy treatments. The bill lists twenty-three of these twenty-seven treatments on dates in November and December, 1972, and January, 1973, all before the date of Respondent's note to Dr. Sobkov dated January 23, 1973. This false report was forwarded by Berman to the insurer as proof of damages in support of Crawford's claim.

"Respondent's testimony concerning the Crawford matter was essentially the same as that which he gave in the case of Harry Street, supra.

### "The Case of Roberta Crosby

"The evidence with respect to the Crosby matter consisted of the testimony of Morris S. Berman and a series of papers from his office file, introduced as Commission Exhibit 6A through 6G. Crosby did not appear as a witness. Exhibit 6A is a Negligence Information Form filled out by someone other than Respondent at the time Crosby was first interviewed on November 19, 1973, stating the date of accident to be November 17, 1973. Exhibit 6G is the office carbon copy of a form letter dated November 19, 1973, to Dr. Leonard Gilmor referring Crosby to him for treatment. This letter has the typed name of the Respondent as the sender. Exhibit 6B is a carbon copy of the completed form of which Exhibit 6G is the office copy, showing a written signature of the Respondent per VF. On this letter is written, 'Never came in.' A date stamp on Exhibit 6B shows that it was received in the Berman office on December 12, 1973. Exhibit 6C is a carbon copy of a note dated December 17, 1973, in the handwriting of the Respondent addressed to Crosby in which

the Respondent states, 'Dr. Gilmor advises that you have not yet seen him. Please arrange to see him immediately ...' Exhibit 6D is a report of Dr. Gilmor dated April 26, 1974, stating that Crosby was examined by the doctor on November 19, 1973. Attached is Dr. Gilmor's bill dated July 18, 1974, charging for seven physical therapy treatments rendered on dates in November and December, 1973, before December 17, 1973, the date of Respondent's note — Exhibit 6C. Exhibit 6D was forwarded by Berman to an adjuster for the insurer as proof of damages in support of Crosby's claim.

"Respondent did not testify specifically concerning the Crosby matter.

### "The Case of Mutiu Akinsemoyin

"The evidence in the Akinsemoyin matter consisted of the testimony of Morris S. Berman and a series of papers from his office file, introduced as Commission Exhibit 10A through 10J. Akinsemoyin did not appear as a witness. Exhibit 10A is a Negligence Information Form filled out by Respondent at the time Akinsemoyin was first interviewed on December 4, 1973, stating that the date of the accident was December 2, 1973. Exhibit 10C is the office carbon copy of a letter showing the typed signature of Respondent dated December 5, 1973, referring Akinsemoyin to Dr. Frank Roberts. Exhibit 10B is a carbon copy of the completed form on which Exhibit 10C is the office copy, showing the written signature of the Respondent per VF. On this letter is written, 'Never came in' and in another place, 'Not in to Dr.' A date stamp on Exhibit 10B shows that it was received in the Berman office on December 18, 1973. Exhibit 10D is an office carbon copy of a form letter dated December 20, 1973, to Akinsemoyin showing that a blank had been filled in with 'Frank Roberts, 5212 Harford Road, Baltimore, Maryland 21214, to be examined in reference to your accident case' over the typed signature of the Respondent. Exhibit 10G is a report and a bill of Dr. Frank Roberts, both dated April 23, 1974, addressed to Respondent showing that Akinsemoyin

was seen on December 7, 1973. Dr. Roberts' bill charged for treatment rendered on four dates in December, 1973, before December 20, 1973, the letter referring Akinsemoyin for examination. Exhibit 10A is a carbon copy in the handwriting of the Respondent of a letter forwarding Dr. Roberts' bill to the General Adjustment Bureau as proof of damages in support of Akinsemoyin's claim. Exhibit 10I indicates that the Respondent negotiated the settlement of this claim.

"Respondent did not testify specifically concerning the Akinsemoyin matter.

### "*The Case of Robert Lee Johnson and The Case of Emmanuel Lufadeju*

"While there was lengthy testimony and several exhibits offered in connection with these matters, the evidence did not establish any impropriety with the same clarity as shown re Street, Crawford, Crosby and Akinsemoyin, supra. Consequently, no useful purpose would be served by a detailed outline of them.

### "*Finding of Fact*

"In the cases of Harry Street, Charles Crawford, Roberta Crosby and Mutiu Akinsemoyin the evidence is clear that false and fraudulent medical reports and bills for medical services were used by the Respondent as proof of damages in claims for personal injuries. The evidence is equally clear that the Respondent knew that the evidence was false or that it should have been obvious to him that the evidence was false.

"Respondent's explanation that he was handling so many cases that he did not have time to review the evidence he was compiling is unacceptable.

"*Conclusion of Law*

"By this conduct, Respondent violated DR 7-102 (A) (4) and (6) and DR 1-102 (A) (1), (4), (5) and (6).

## "4. THEFT OF INFORMATION FROM BERMAN'S OFFICE FILES

"In September, 1974, following his plea of guilty in the U. S. District Court to one count of mail fraud Morris S. Berman submitted his petition for resignation to the Court of Appeals of Maryland requesting that he be allowed until January 1, 1975, to wind up his practice. In the ensuing weeks there were many conversations between Berman and the Respondent to the effect that Respondent would take over Berman's practice, but no final agreement or financial settlement was reached. On November 8, 1974, the Court of Appeals accepted Berman's resignation with prejudice effective immediately. Respondent testified that during the weeks immediately following his disbarment, Berman took many of the manila case files from his office to his home and threatened to destroy them if financial arrangements could not be made whereby he could profit from them. Respondent stated that he was anxious to finalize taking over Berman's practice but had difficulty arriving at a basis for assessing its value. Shortly before Thanksgiving, according to Respondent, Berman proposed that the practice continue under Respondent's name with Berman remaining as his assistant in a capacity similar to that of an insurance adjustor which Berman contended did not constitute continuing to practice law. Respondent testified that he rejected this plan which precipitated in Berman's ordering him out of the office.

"At that time Respondent and L. Paul Snyder, Jr., a relative newcomer, were the only associates in Berman's office. The testimony was indefinite as to the number of open files in Berman's office which were being serviced by the Respondent and Snyder but it appears that the number was probably in excess of 600. When an office file was opened

there were completed multiple copies of a 5″ x 8″ information sheet listing the basic identifying data concerning the case. One copy became the label on a manila envelope file which was created for each client. A pink copy of the file label was used as an index card. On Tuesday preceding Thanksgiving, 1974, when Berman was absent from the office, Respondent directed his associate Snyder and two secretaries, Maureen Ferrara and Linda Farrow to take the pink index cards relating to the cases being serviced by Respondent and Snyder and copy onto the backs of these pink slips from the manila files certain basic information concerning each case, such as medical information, the number of the police report, the insurer and the insurance claim number and the like, all of which necessitated working overtime that evening. On Wednesday night before Thanksgiving, without Berman's knowledge, Respondent and Snyder had their office possessions moved from Berman's office to another office in the same building, taking with them the pink slips previously referred to. During the night hours, at the direction of Respondent, Linda Farrow made photocopies of these slips. Several days later the original pink slips were returned to Berman. Commission Exhibit 21 is a group of these pink slips, numbering well over 200.

"Respondent testified at great length that this was done in order to inventory the cases which he hoped to acquire from Berman and enable him to place a value on them.

"The Commission contends that Respondent's purpose was to get sufficient information from each file so that he could recreate the file and represent the client involved, realizing that he would not be able to reach an agreement with Berman and that Berman's complete office file would not be turned over to him.

"Thereafter Berman completed arrangements for transferring his case files to Allen B. Spector, Esquire, with whom he had made financial arragements. There was no written agreement between Berman and Spector and the evidence is not clear as to what payments, if any, Berman later received from Spector. It is clear that Berman was seeking reimbursement for any money legitimately expended by him

on behalf of former clients, such as court costs, costs of police reports, etc. and also payment on a quantum meruit basis for his legal services rendered clients before his disbarment.

"On December 9, 1974, a letter was sent out under the auspices of the Baltimore City Bar Association to Berman's former clients advising them that Berman recommends Spector for the future handling of their cases and that their files were in Spector's office. The client was told to retain a lawyer of his own choice to whom Spector would deliver the client's file. The letter also stated that Respondent and Snyder, former associates of Berman, were continuing practice at their new location. Commission Exhibit 20 is a copy of this letter. In addition to the Bar Association letter, Respondent also sent printed announcements to Berman's former clients giving the new location and telephone number of Respondent and Snyder. Respondent testified that these accouncements were not mailed until well after the Bar Association letter. Commission Exhibit 22 and 22A is one such announcement and envelope postmarked February 21, 1975. Respondent could not explain Commission Exhibit 32 and 32A which was another such announcement and envelope postmarked December 7, 1974.

"The Commission contends that Respondent's mailing of the announcements violated Respondent's agreement with the Bar Association and/or Berman that only the Bar Association letter would be sent to Berman's former clients. Respondent denied that any such agreement was reached.

"Respondent testified that after the Bar Association letter and his announcements were sent out many of Berman's former clients whom he had come to know came to him for representation but that he was unable to secure the original office files from Spector. However, by use of the information on the pink slips and with the cooperation of insurance companies, he was able to create a duplicate file and ultimately settle many cases. Respondent testified that he concluded that Berman had no legal claim to any of the proceeds of these settlements, neither for legitimate expenses incurred by Berman before his disbarment nor for legal services rendered before his disbarment on a quantum meruit basis.

Respondent's Exhibit 9 is a legal memorandum from The Research Group, Inc. dated February 9, 1976, concluding that the majority view in this country is that the disbarment of an attorney is tantamount to voluntary abandonment of the attorney's contract with the client and therefore bars recovery by the attorney either in contract or in quantum meruit for services rendered. Consequently Respondent made no such payments to Berman.

"The evidence disclosed that Respondent's income from the practice of law during 1974 was $27,198. The following year, 1975, his income was $47,566. Respondent testified that this increase in his income in 1975 was due to his representation of former clients of Berman who came to him for continued representation.

### "Finding of Fact

"During his association with Morris S. Berman, much of Respondent's time was spent accumulating information about claims being prosecuted for Berman's clients. However, as a salaried employee of Berman, Respondent acquired no property interest or claim of right in the information contained in Berman's office files at the time of Berman's disbarment. Consequently, the removal and photocopying of Berman's records summarizing the contents of Berman's office files was an illegal appropriation of the information contained therein. Whether this information was useful in attempting to reach a financial agreement with Berman is immaterial, as the evidence is clear that it was not used for this purpose but instead was used by Respondent for his own financial benefit in facilitating his representation of former Berman clients.

"The question of whether or not Berman was entitled to receive from Respondent any of the proceeds realized from the cases of former Berman clients whom Respondent represented is irrelevant to and need not be decided for the purpose of these proceedings.

"The court finds that Respondent's mailing of an announcement to Berman's former clients did not violate an

agreement between Respondent and/or Berman and the Bar Association of Baltimore City. However, it was improper for Respondent to use for this purpose information improperly appropriated from Berman's office files.

### "Conclusion of Law

"By this conduct, Respondent violated DR 1-102 (1), (4), (5) and (6).

### "RESPONDENT'S MOTION TO DISMISS BASED ON LACHES

"The Commission's Petition for Disciplinary Action recites that Bar Counsel was notified on March 16, 1978, that the Review Board on December 15, 1977, had directed that charges be filed against the Respondent. The Petition for Disciplinary Action was filed in the Court of Appeals of Maryland on February 6, 1980. Respondent contends that there was an unreasonable and unjustifiable delay in the institution of these proceedings which has resulted in prejudice to the Respondent. While conceding that there is no Statute of Limitations applicable to disciplinary proceedings, Respondent contends that such proceedings are equitable in nature and that the instant Petition should be dismissed because the Commission is guilty of laches.

### "Finding of Fact

"Assuming without deciding that the defense of laches is applicable in disciplinary proceedings, there is no substantial evidence that the Respondent has been prejudiced by the delay in prosecuting the instant charges.

"On the contrary, the passage of time from the date of the violations by the Respondent found herein to the date of the hearing on these violations has enabled the Respondent to present evidence of good behavior and gratuitous service to worthy causes over the past five and one-half years.

*"Conclusion of Law*

"The Maryland law relating to laches is too well known to bear repetition here. *See Parker v. Board of Election Supervisors,* 230 Md. 126 at 130; also *Bowie v. Ford,* 269 Md. 111 at 122.

"Respondent's Motion to Dismiss on the grounds of laches is hereby denied."

## B.

Kahn took exception to Judge Grady's findings in only three particulars. First, he contends that Judge Grady erred in refusing to adopt his proposed findings (a) that at no time since Thanksgiving, 1974 had he violated any Disciplinary Rule, and (b) that his conduct prior to and subsequent to his association with Berman was so exemplary that his practice of law should not now be interrupted. These findings, according to Kahn, were "crucial" on the question of the sanction to be imposed upon him for his misconduct. Second, Kahn claims that Judge Grady erred in finding that he used a double checking scheme "when transacting business with his own clients, and that he committed an 'illegal appropriation of the information' he removed from Berman's office in November of 1974." Third, Kahn maintains that Judge Grady erred in concluding that the defense of laches was inapplicable in this case.

Of course, the factual findings of the hearing judge in an attorney disciplinary proceeding are prima facie correct and will not be disturbed on review unless clearly erroneous. *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 420 A.2d 940 (1980); *Bar Ass'n v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973). In oral argument before us on the exceptions, Kahn conceded that clear and convincing evidence was adduced before Judge Grady from which he could properly find, as he did, that Kahn was extensively implicated in the payment of money to runners to obtain clients for Berman; and that he knowingly used false and fraudulent medical reports and bills as proof of damages in conducting

settlements in personal injury cases involving Berman's clients.

We think Judge Grady's findings with respect to Kahn's involvement in the "double checking scheme" are also supported by clear and convincing evidence as required by Rule BV10 d. In addition, we find no merit in Kahn's exception concerning the misappropriation of Berman's clients' files. The record demonstrates, clearly and convincingly, as Judge Grady found, that Kahn illegally appropriated the information from Berman's files for his own financial benefit in facilitating his plan to represent Berman's former clients.

Notwithstanding his misconduct, which occurred between 1972 and 1974, Kahn suggests that disbarment some seven years later would be an inappropriate sanction for a number of reasons: that as a salaried associate in Berman's firm he did not personally profit from his misconduct; that he was a mere employee required to follow Berman's directions or face dismissal if he did not obey; that he was young and relatively new to the bar at the time he entered Berman's employ, having been in practice prior thereto for only three years; that the misconduct in which he engaged was a common practice, tacitly accepted by the bar in Baltimore City; that he was unable to obtain other employment and for that reason did not terminate his association with Berman; and that his unblemished record of professional conduct both prior to and subsequent to his involvement with Berman and his participation in numerous civic and charitable activities since 1974 demonstrate that there is no need to impose a severe sanction upon him to protect the public.

It is evident that the heart of the charges against Kahn involves his knowing use of false and fraudulent medical reports and bills to enhance the value of personal injury claims filed with insurance companies. Although never charged criminally for his participation in these illegal activities, it is clear that Kahn's fraudulent misconduct involved moral turpitude similar to that involved in *Attorney Griev. Comm'n v. Klauber*, 289 Md. 446, 423 A.2d 578 (1981), and *Attorney Grievance Comm'n v. Reamer*, 281 Md.

323, 379 A.2d 171 (1977), in each of which cases disbarment was ordered. We think, therefore, that Bar Counsel's exception to Judge Grady's failure to find that Kahn's misconduct in this regard involved moral turpitude in violation of DR 1-102 (A) (3) is well taken and will be sustained.

We have repeatedly held that misconduct involving moral turpitude will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction. *Klauber, supra; Attorney Griev. Comm'n v. Barnes,* 286 Md. 474, 408 A.2d 719 (1979); *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974). In determining whether Kahn has exhibited the requisite foundation for a sanction less than a disbarment, we consider whether the proffered circumstances diminish the degree of culpability inherent in his guilt. *Attorney Griev. Comm'n v. Lebowitz,* 290 Md. 499, 431 A.2d 88 (1981); *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975).

It is true that Kahn was not the prime mover or architect of the illegal scheme with which he willingly associated himself in Berman's office. The record does show, however, that Kahn was Berman's primary associate with authority to draw checks on the office escrow account, to charge business expenses on Berman's credit cards and to take charge of the office when Berman was absent, which was customarily one day each week. Kahn routinely conducted settlements with clients and insurers over an extended period of time, and admittedly engaged in the very same illegal conduct for which Berman was subsequently convicted in federal court (mail fraud) and later disbarred.

Factors such as the age and inexperience of an attorney and the lack of personal gain involved in an act of misconduct may in some circumstances influence the sanction to be imposed. *See, e.g., Attorney Griev. Comm'n v. O'Neill,* 285 Md. 52, 55-57, 400 A.2d 415 (1979) (act of misconduct occurred a short time after respondent was admitted to the bar); *Prince George's Co. Bar Ass'n v. Vance,* 273 Md. 79, 84,

327 A.2d 767 (1974) (absence of personal gain among the factors weighing against disbarment). However, in Maryland St. Bar Ass'n v. Frank, 272 Md. 528, 539, 325 A.2d 718 (1974), where an attorney was disbarred for attempting to bribe a Deputy State's Attorney, the Court said:

> "We reject respondent's suggestion that his youth and inexperience can mitigate our duty to protect the public and the integrity of the legal profession *when the transgression is as venal as this record shows.*" (Emphasis added.)

Furthermore, although the record does not indicate that Kahn received a monetary reward for each specific act of misconduct in which he engaged, it cannot thereby be concluded that he did not personally gain as a result of his misconduct. *See, e.g., Bar Ass'n of Balto. City v. Snyder,* 273 Md. 534, 537, 331 A.2d 47 (1975). The evidence shows that as time progressed Kahn become more deeply involved in Berman's illegal activities and that he received continuing increases in his salary. In these circumstances, it cannot be concluded that Kahn's continuing willingness to aid in the illegal prospering of Berman's practice was without personal gain to himself.

That Kahn, in order to retain his associate position with Berman, may have deemed it necessary to engage in the fraudulent and other illegal and unethical activities in question is hardly a circumstance mitigating the sanction to be imposed for his knowing misconduct. Obviously, the high ethical standards and professional obligations of an attorney may never be breached because an attorney's employer may direct such a course of action on pain of dismissal, or the particular misconduct is thought to be consistent with similar misconduct engaged in by other lawyers in the same locality. *See Agnew, supra.*

In support of his contention that his unblemished record prior to and subsequent to his association with Berman calls for a sanction less than disbarment, Kahn relies on *Attorney Griev. Comm'n v. Freedman,* 285 Md. 298, 402 A.2d 75 (1979), and *Attorney Griev. Comm'n v. Howard,* 282 Md.

515, 385 A.2d 1191 (1978). As in Kahn's case, disciplinary proceedings were instituted against Freedman and Howard a number of years after their acts of misconduct were committed. Howard was found to have neglected his clients' cases and to have been in contempt of court on three occasions, in violation of the Disciplinary Rules. Freedman admitted paying a runner to refer personal injury cases to him. In both cases, we adopted the recommendation of the hearing judge or judges and imposed a public reprimand, due in part to the delay in bringing the disciplinary proceedings, and because the offending attorneys had mended their ways and discontinued their unethical conduct.[1] Neither case, however, involved the degree of misconduct now present before us.

In *Maryland St. Bar Ass'n v. Callanan,* 271 Md. 554, 318 A.2d 809 (1974), the attorney was convicted in 1970 of willfully attempting to evade the payment of federal income taxes in 1962 and 1963, an offense involving moral turpitude. We rejected the contention that only a reprimand or a suspension was required because of the length of time which had elapsed between the initiation of the investigation and the formal proceedings.

Accepting for the purposes of this case that Judge Grady should have found as a fact that Kahn had not violated any of the Disciplinary Rules since leaving Berman's employ in 1974, such a finding would not lessen the sanction to be imposed for the misconduct which occurred in this case.[2] It is true, as Kahn asserts, that the purpose of disciplinary proceedings is to protect the public, rather than to punish the erring attorney. *See, e.g., Kerpelman, supra,* 288 Md. at 382; *Attorney Griev. Comm'n v. Bailey,* 286 Md. 630, 637, 408 A.2d 1330 (1979). However, Kahn is wrong in his

---

1. In *Freedman,* the attorney voluntarily terminated his unethical conduct and disclosed it to federal investigators. In *Howard,* the hearing court found as a fact that the offending attorney's misconduct was not motivated by dishonesty or greed.

2. Judge Grady properly declined to make a finding, as requested by Kahn, that his post-Berman conduct was so exemplary that this Court, as the sanctioning body, should not disbar him.

perception that his disbarment will not further this purpose. The disbarment of an attorney protects the public not only from being further victimized by the attorney himself, *Attorney Griev. Comm'n v. Flynn,* 283 Md. 41, 388 A.2d 775 (1978), but also, much more relevant in this case, it protects the public "because it demonstrates to members of the legal profession the type of conduct which a court will not tolerate," *Kerpelman, supra,* 288 Md. at 382, and is necessary "to preserve the integrity of the legal and judicial system of Maryland," *Callanan, supra,* 271 Md. at 557. In *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975), a case involving willful tax evasion by an attorney who advanced arguments similar to those here presented by Kahn, we noted:

> "[T]he respondent notes that his 'record as a member of the Bar for over forty years was unblemished and [that he is] . . . held with obvious esteem in his community, both as a lawyer and as a family man,' which he asserts are extenuating circumstances warranting a lesser sanction than disbarment. These plaudits tend to make more distasteful our responsibility in this type of proceeding; but, because 'an attorney's character *must remain beyond reproach,'* this 'Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public.' (emphasis added) *Maryland St. Bar Ass'n v. Agnew, supra* at 549; see *Balliet v. Balto. Co. Bar Ass'n,* 259 Md. 474, 270 A.2d 465 (1970). Our constancy in this responsibility cannot be shaken by our respect for an individual attorney's reputation, by our recognition of the longevity of his career at the bar, or by our appreciation for his service to the community." 275 Md. at 528-29 (emphasis in original).

In concluding that none of the reasons cited by Kahn justify a sanction other than disbarment in the circumstances of this case, we have found no merit in Kahn's argument that laches was a defense to the charges filed against him. While the delay in Kahn's case was gross and inexcusable — a fact readily acknowledged by newly appointed Bar Counsel during oral argument on the exceptions — we agree with Judge Grady that the evidence does not show that Kahn was prejudiced by the delay. Because the purpose of disciplinary action against an attorney is to protect the public, dismissal of the disciplinary petition for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted. *See Anne Arundel Co. Bar Ass'n v. Collins,* 272 Md. 578, 325 A.2d 724 (1974); *Bar Ass'n of Balto. City v. Posner,* 275 Md. 250, 339 A.2d 657 (1975).

Disbarment is the appropriate sanction in this case, and we therefore direct that the name of Richard Stephen Kahn be stricken from the rolls of those authorized to practice law in Maryland.

> *It is so ordered; respondent shall pay all costs as taxed by the clerk of this Court, including the costs of all transcripts, pursuant to Maryland Rule BV15 c for which sum judgment is entered in favor of the Attorney Grievance Commission against Richard Stephen Kahn.*

*Eldridge, J., dissenting:*

Although Kahn's misconduct, as found by the trial judge, was extremely serious and requires strong disciplinary action, I believe that the ultimate sanction of disbarment is not warranted under all of the circumstances of this case. Instead, I would favor a substantial suspension.

Preliminarily, I cannot agree with the majority's sustaining the exception to Judge Grady's refusal to find

that Kahn's misconduct involved moral turpitude similar to that involved in *Attorney Griev. Comm'n v. Klauber,* 289 Md. 446, 423 A.2d 578 (1981), and *Attorney Griev. Comm'n v. Reamer,* 281 Md. 323, 379 A.2d 171 (1977), and in the majority's making this finding *de novo* for itself. The trial judge heard the witnesses, including the testimony of Kahn. Furthermore, there were many facts before the trial judge distinguishing this case from *Klauber* and *Reamer.* Kahn was a salaried employee, not directly profiting from the misconduct and obeying instructions from his employer — a senior attorney. Unlike Klauber and Reamer, he was not criminally convicted; in fact, the United States Attorney's office refused to prosecute him. The experienced trial judge, hearing Kahn's and Berman's testimony, taking into consideration Berman's vindictiveness, and seeing basic differences between this case and the *Klauber* and *Reamer* cases, was entitled to conclude that Bar Counsel had failed to persuade him that Kahn had the same fraudulent intent involved in *Klauber* and *Reamer.*

Apart from the above-discussed "finding," there are in this case mitigating circumstances which properly bear upon the sanction to be imposed. The majority admits that "[i]t is true that Kahn was not the prime mover or architect of the illegal scheme." The majority acknowledges that Kahn was young and inexperienced. He was a salaried employee, hired only three years out of law school in a "plaintiff's personal injury" practice which conducted business in a certain manner. He was following the requirements of his superior, a more experienced attorney. Being on salary, he did not directly benefit from the improper practices.

Although the manner of practicing by Berman was illegal and unethical, it was, unfortunately, a known common practice among many similar firms in Baltimore City at the time. This has been shown in the many criminal investigations and prosecutions in recent years, as well as by information conveyed by Baltimore City lawyers since the commencement of those criminal investigations. We often tell young lawyers that they do not learn the "practical" aspects of practicing law from law school but that such

knowledge comes from experience, acquired from working for law firms or for more senior members of the bar. While not excusable, it is understandable that a relatively new member of the bar, going to work for a law firm or for an experienced attorney, and seeing how things are actually done in practice, would acquiesce, even though he knew or suspected that the manner in which the law practice was conducted was wrong.

Although the majority does not dispute the existence of the above-discussed factors in this case, the majority either simply discounts them or seems to say that they do not excuse Kahn's misconduct. I fully agree that none of these factors excuse Kahn's misconduct; he should have known, and admitted that he did know, that the practices in which he engaged were wrong. Nevertheless, these factors should be considered in determining the appropriate sanction. Considering all of the circumstances, I would not disbar this young attorney but would suspend him for a substantial period of time.

Judges Cole and Davidson have authorized me to state that they concur with the views expressed herein.