511 A.2d 56

### ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

### James B. McCLOSKEY.

**Misc. Docket (Subtitle BV) No. 32, Sept. Term, 1985.**

Court of Appeals of Maryland.

July 11, 1986.

Robert P. Conrad, Asst. Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel for the Atty. Grievance Com'n of Md., for petitioner.

Robert Cahill, Sr., and Stephen B. Caples, Baltimore, for respondent.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

We shall disbar in this case involving "quickie" foreign divorces and misleading attorney advertising.

Bar Counsel, acting pursuant to the provisions of Maryland Rule BV9, filed a petition with us on behalf of the Attorney Grievance Commission seeking disciplinary action against James B. McCloskey, a member of the Maryland Bar since November 10, 1954. The petition alleged violation of Disciplinary Rules 1–102(A)(1), (4), and (5); 2–101(A)(2), (3), and (4); 2–109(1); 6–101(A)(1), and (2); and 7–102(A)(8).[1]

---

1. The Disciplinary Rules in question state in relevant part:
   "DR 1–102 Misconduct.
   "(A) A lawyer shall not:
       (1) Violate a Disciplinary Rule.
       (2) ...
       (3) ...
       (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
       (5) Engage in conduct that is prejudicial to the administration of justice."
   "DR 2–101 Publicity.
   "(A) A lawyer, on behalf of himself, his partner, associate, or any other lawyer affiliated with him or his firm, shall not personally, through an advertising group, lawyer referral service, or otherwise, prepare, cause to be prepared, use, or participate in the use of any advertisement or other public communication

Pursuant to Rule BV9 b we referred the matter for hearing to a judge of the Third Judicial Circuit of Maryland. He has filed a comprehensive report with us. After setting forth the bases of the three complaints, the report states:

*"General Findings of Fact*

"Prefatory to addressing the three complaints individually, we first note findings of fact that are applicable generally to all the complaints and, therefore, provide a framework for the subsequent discussion. These findings of fact concern:

containing information about the services of lawyers or law firms which:

(1) ...

(2) Is likely to mislead or deceive because in context it makes only a partial disclosure of relevant facts;

(3) Is intended or is likely to create false or unjustified expectations of favorable results;

(4) Contains any other statement that is intended or likely to cause a reasonable person to misunderstand or be deceived...."

"DR 2–109 Acceptance of Employment.

"A lawyer shall not accept employment on behalf of a person if he knows or it is obvious that such person wishes to:

(1) Bring a legal action, conduct a defense, or assert a position in litigation, or otherwise have steps taken for him, merely for the purpose of harassing or maliciously injuring any person."

"DR 6–101 Failing to Act Competently.

"(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances."

"DR 7–102 Representing a Client Within the Bounds of the Law.

"(A) In his representation of a client, a lawyer shall not:

(1) ...

(2) ...

(3) ...

(4) ...

(5) ...

(6) ...

(7) ...

(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

"1. The Respondent's role in running the business known as 'Divorce Services,' and

"2. The applicability of the Disciplinary Rules to the Respondent in his role as 'Divorce Services.'

"As to the first concern, this Court finds that Respondent is solely responsible for conducting the business known as 'Divorce Services.' The Court has also considered Respondent's work history since his admission to the Maryland Bar in 1954. The evidence clearly indicates that following his ten year partnership in a Baltimore law firm, Respondent gave up the general practice of law in order to pursue the business of appraising and buying antiques. Notwithstanding this, it is uncontroverted that Mr. McCloskey at no time changed his status as an attorney during his fifteen years as an antique dealer.[1] The Court further finds that the actions and activities connected with the running of the business known as 'Divorce Services' clearly involved Respondent acting as a lawyer. The Respondent himself admitted on the stand that much of the advice given to clients on the telephone did clearly involve knowledge of the law. Mr. McCloskey stated:

'See, my problem is I did not consider the fact that I was practicing law. I'm starting to realize now, after all of this, that perhaps I was, and I made a terrible, terrible mistake.' (T.26).

"The Court also notes that even though the actual cases were handled by the foreign attorney, and even though Respondent acted under a trade name, McCloskey further represented himself as a qualified attorney by sending out business cards which read 'James B. McCloskey, Attorney-at-Law,' regardless of the fact that such cards may have been sent in some cases *after* the foreign divorces were procured. (T. 15, 74).

"As to the applicability of the Disciplinary Rules to the Respondent in this case, the Court heard argument that in his role as owner of the referral business known as 'Divorce Services,' Mr. McCloskey was not subject to these rules. Clearly, the Disciplinary Rules set out what 'a lawyer' may or may not do. However, in light of the previous discussion, the Court concludes that Mr. McCloskey was clearly acting as a lawyer, and thus was subject at all times to these rules.

*"Findings of Fact: 'O'Meara Complaint'*

"Pursuant to obtaining their respective divorces, Mr. and Mrs. O'Meara responded to an advertisement in the *National Enquirer,* a nationwide publication, which was placed by Respondent and which read:

'DIVORCE, QUICKIE, Dominican Republic. From $275.00—"One Day" Qualified Attorney. James McCloskey, 800–638–1862. Validity varies by State.'

Respondent admits responsibility for placing this ad, and for procuring and maintaining an '800' telephone number. Respondent further admits that the phrase 'validity varies by State' was required by the *Enquirer,* and was not included in similar ads he placed in other local and national publications. It is further uncontroverted that Respondent advised Mrs. O'Meara by telephone as to the procedure for obtaining a 'Dominican divorce,' sent her a packet of information, and received a fee for his services. Again, this Court rejects the contention that such fee was merely for 'referral,' due to the legal nature of the advice given. It is also noted, by Respondent's own admission on the stand, that proper research was not conducted as to Louisiana law and recognition *vel non* of foreign divorce decrees.[2]

"The statutory law of Louisiana in fact provides that divorces obtained in foreign jurisdictions are invalid.[3] Louisiana law further illustrates that although one may be estopped from attacking the validity of a subsequent marriage, a prior divorce obtained by a spouse who trav-

eled to a foreign jurisdiction for the sole purpose of obtaining said divorce nevertheless would be deemed a nullity. *Super v. Burke,* (1979 La.App.) 367 So.2d 93, cert. gr. (La.) 369 So.2d 466.

"In this case, the Court finds that Respondent misrepresented to the O'Mearas his knowledge of the law. As stated previously, Respondent did little or no research in the area of recognition of foreign divorce decrees in the various jurisdictions of the nation. Mr. McCloskey knew these callers were from Louisiana; he invited such out of state inquiries by advertising in national publications and using an '800' number; and he proceeded to give legal advice to these Louisiana residents who were led to believe they were speaking with a 'qualified' and 'competent' attorney.

"Respondent did testify that he told Mrs. O'Meara on the telephone that the divorce she was to obtain was voidable.[4] While there was no evidence presented to dispute this, the Court finds significant the fact that Respondent failed to include this information either in the ad, or in the printed information he sent to his customers (clients). To the contrary, the Court finds that Mr. McCloskey, in writing, led these people to believe that he totally 'stood behind' the foreign decrees obtained.[5]

"The Court finds it curious that if Respondent in fact was so careful to warn all of his customers (clients) that the decrees were voidable, surely such warning should also have been put in writing. The Court finds, notwithstanding the telephone warning, that individuals were misled by Respondent's recommendation of these divorces, and his statement in writing that '... they are legal and binding in the United States.' (T. 81).

"The Court further finds that the advertisement clearly created the unjustified expectation in the minds of the O'Mearas that they would be getting competent advice based on the law of their own jurisdiction. While Respondent argues that the words 'Qualified Attorney' referred to the qualified attorney in the Dominican Republic, it is

clear to this Court that a reasonable person reading the ad would be misled into believing that these words referred to the only name mentioned in the ad—that of James B. McCloskey. The Court further finds as a fact that the O'Mearas, and others who called the telephone number in the ad and actually spoke with Respondent, would reasonably conclude by the legal nature of the advice given, that they were in fact speaking with an attorney, and not merely with the 'president' of the company known as 'Divorce Services.'

"The Court further finds that the words 'Validity Varies by State' were not sufficient to serve as a disclaimer. It was the *Enquirer,* and not the Respondent, that required the phrase. (T. 62). Furthermore, even after this ad appeared, Respondent did not put these words in other ads which he placed. The Court does accept the fact that these words did appear in the ad which the O'Mearas read. Nevertheless, the Court finds that although the O'Mearas may have understood that 'Validity Varies by State,' it was reasonable for them to believe that the person they telephoned, Mr. McCloskey, would know the validity of such decrees in their home state of Louisiana.

"The Court in this case also finds facts relevant to Mr. McCloskey's violation of Disciplinary Rule 2–109. It is clear that by responding to the telephone inquiries, and receiving fees from these callers, Respondent was, in effect, accepting their employment. Respondent testified that he felt that his efforts in helping obtain foreign divorces would at least serve to 'harass' non-consenting spouses into acceding to the wishes of the spouse seeking the divorce. (T. 28, 31).

*"Conclusions of Law: 'O'Meara Complaint'*

"The Court finds by clear and convincing evidence that the Respondent violated Disciplinary Rules 1–102, 2–101, 2–109, 6–101, and 7–102. He engaged in conduct involving misrepresentations of his status and his knowledge of

the law, thus constituting the violations of Disciplinary Rules 1–102, 6–101, and 7–102.

"The Court notes that advertising by lawyers is a relatively recent development. There have not been sufficient guidelines set out, or Court rulings that prescribe proper conduct in this area. To that extent, Respondent may have inadvertently gotten himself into the present predicament. Notwithstanding this, the Court is convinced that these ads misled the public in various jurisdictions that they would be dealing with an attorney who was prepared with knowledge of foreign divorce law in every jurisdiction. Respondent is clearly in violation of Disciplinary Rule 2–101. The ads in question were deceptive, and created unjustified expectations in the minds of those who responded to them.

"The Court is further convinced that Respondent violated Disciplinary Rule 2–109 by accepting employment 'merely for the purpose of harassing or maliciously injuring any person.'

### *"Findings of Fact: 'Baxter Complaint'*

"This Court finds by clear and convincing evidence that Respondent was instrumental in procuring a Mexican divorce for Complainant, Cynthia Lee Baxter, a resident of California. Ms. Baxter was referred to Mr. McCloskey through an arrangement he had made with a Legal Care Clinic in that State. Respondent advised Complainant as to the procedure for obtaining the 'quickie' divorce, and accepted a fee for his services.

"This Court finds that Respondent was acting as an attorney and represented himself as one knowledgeable as to the law in California with respect to recognition of foreign divorces. However, Mr. McCloskey continued to be confused about the validity of Mexican divorces even after he learned of Mrs. Baxter's problem with the military.[6]

"In fact, California does not recognize divorces obtained in any foreign jurisdiction, if the parties are domi-

ciled in California at the time of the foreign divorce.[7] Although the statutory law does provide protection for 'putative spouses' of subsequent marriages, those subsequent marriages are nevertheless void.[8]  In any event, the Court finds that Complainant in this case was denied service benefits because the U.S. Marine Corps did not recognize the Mexican divorce obtained by Mrs. Baxter. Thus, Complainant was misled by Mr. McCloskey as to the genuineness of the divorce she obtained.

"The Court also finds that Mrs. Baxter was never even verbally informed that her divorce may be 'voidable.'  Mr. McCloskey testified, '. . . No, I never spoke to Miss Baxter until after the complaint was filed, sir.' (T. 38).  Yet, Respondent admitted that he acted as an attorney subsequently to Mrs. Baxter's problem with the military.[9]

### *"Conclusions of Law: 'Baxter Complaint'*

"The Court finds by clear and convincing evidence that Respondent, acting as an attorney, violated Disciplinary Rules 1–102, 2–109, 6–101, and 7–102.  The findings, like those in the 'O'Meara Complaint,' show that Respondent failed to research the law of California, and misrepresented himself as an attorney whose advice was based on sound knowledge of the law.  However, the Court, as to this complaint, does not find by clear and convincing evidence that Respondent engaged in misleading advertising (Disciplinary Rule 2–101).  There is no evidence that Mrs. Baxter responded to an advertisement, but rather was led to Mr. McCloskey through a California Clinic.

### *"Findings of Fact: 'Williams Complaint'*

"The Court finds that Complainant is a Maryland resident, whose husband had procured a foreign divorce through 'Divorce Services' and James B. McCloskey, without the knowledge of the Complainant, Darlene K. Williams.  It is clear in this case, as in the others, that Respondent had not researched, and was unfamiliar with,

the law as to recognition of foreign divorces in the State of Maryland. (T. 34 and 35).

"The Court notes that the grievance in this complaint was brought to the attention of Bar Counsel by a person who was victimized by Respondent's actions, rather than by Respondent's customer (client) himself. Thus, Mr. McCloskey's representations to his 'client' are not at issue in this particular complaint.

"However, based on the evidence before the Court, it is uncontroverted that Mr. McCloskey did accept employment on behalf of Mr. Williams. Respondent also admitted that procurement of a foreign divorce would at least serve to harass spouses who would not consent to a divorce in their own jurisdiction.[10]

### "Conclusions of Law: 'Williams Complaint'

"The Court finds by clear and convincing evidence that Respondent violated Disciplinary Rules 1–102, 2–109, and 7–102. By accepting employment '... merely for the purpose of harassing ... any person,' Mr. McCloskey violated Disciplinary Rule 2–109. It thus follows that Respondent also violated Disciplinary Rule 1–102 and Disciplinary Rule 7–102 by engaging in conduct contrary to a Disciplinary Rule.

"The Defendant presented David J. Preller, Sr. as a character witness. Mr. Preller testified that he had been associated with the Defendant for a period of ten years. During that time he found him to be competent, conscientious and honorable. Mr. Preller indicated that there had never been any difficulty or complaints about any of the work done by Mr. McCloskey. At the conclusion of the ten year period, the Defendant and the witness parted on good terms and, in fact, continued their relationship to the extent that cases from time to time would be referred to him by the Defendant.

"Bar Counsel did not indicate that there had been any previous complaints or grievances filed against the Defendant.

"The demeanor of the Defendant before the Court was that of a remorseful person. The Court notes that several of the complainants lived out of state and yet the Defendant was completely candid in testifying before the Court. He would have made Bar Counsel's case a lot more difficult had he insisted that Bar Counsel prove certain allegations that were difficult to prove without live testimony or at the very least additional documentation.

"Accordingly, the Court must conclude that Mr. McCloskey has put himself in the predicament that he now finds himself because of poor judgment rather than any willful intent to violate the Canons of Professional Responsibility. It is regrettable that so many people have been hurt by Mr. McCloskey's conduct." (Emphasis in original.)

---

"[1] The Court refers to the transcript at page 57:

'Q. And during that 15-year period, did you maintain your license to practice law and contribute annually to the Client Security Trust Fund?

'A. Yes.

'Q. So it has never been terminated?

'A. Right.'

"[2] The Court refers to the transcript at pages 34-35:

'Q. Did you do any research at all into the validity of foreign divorces in general in the United States?

'A. No, sir, I did not. I got into it because in 1981 I went to the Dominican Republic to obtain a divorce myself.

'Q. But other than the fact that you went down there, is it your testimony that you did absolutely no research and had done none, other than that prior to the filing of these complaints—

'A. That is correct.

'Q. —into the validity, if any, of foreign divorce decrees?

'A. I always assumed—I guess I assumed I knew too much. I assumed that if a divorce is valid where issued, that it's valid anywhere, which is not necessarily a truism.'

"[3] The Court takes judicial notice of the Louisiana statute which provides, 'An action for an annulment of marriage, for a separation from bed and board, or for a divorce shall be brought in a parish where either party is domiciled, or in the parish of the last matrimonial domicile. The venue provided in this article may not be waived, and a judgment rendered in any of these actions by a court of

improper venue is an absolute nullity.' LA.CIV. [PROC.] CODE ANN. Art. 3941 (West).

"4 See Transcript, pages 13–14:

'Q. So you told Mrs. O'Meara, according to your testimony, that this was a voidable divorce? . . .

THE WITNESS: Yes.'

"5 The Court refers to the transcript at page 81 wherein Mr. McCloskey read from the fact sheet he sent to his customers (clients), 'We do recommend Dominican Republic divorces as they are legal and binding in the United States. Our associates in the Dominican Republic are bona fide attorneys of long standing and have excellent reputations. We stand 100% behind them. We have hereto attached the rate for a legal Dominican Republic divorce.'

"The Court also notes additional testimony at T–81:

'Q Did you stand behind the validity of the Dominican divorces?

'A. Sure. At that particular point I had no problem with that.'

"6 The Court refers to the transcript at page 46:

'. . . A. Because I found out after the problem with Baxter.

'Q. You found out what?

'A. That the Mexican divorces were not accepted anywhere and that there was specific statute in California against Mexican divorces.

'Q. Did you ever read the California statute?

'A. No, sir.

'. . . A. I know it referred specifically to Mexican divorces, so far as I understand it.'

"7a The Court takes judicial notice of the statutory law of California which provides: 'A divorce obtained in another jurisdiction shall be of no force or effect in this state, if both parties to the marriage were domiciled in this state at the time the proceeding for the divorce was commenced.' CAL. [FAM.LAW] CODE Section 5001 (West). The Act further provides that 'proof that a person hereafter obtaining a divorce from the bonds of matrimony in another jurisdiction was . . . (b) at all times after his departure from this state and until his return maintained a place of residence within this state, shall be prima facie evidence that the person was domiciled in this state, when the divorce proceeding was commenced.' CAL. [FAM.LAW] CODE Section 5002 (West).

"7b The Court also takes note of the following unofficial translation from the General Law of Population of the Republic of Mexico, Article 69:

'Any divorce procedure filed by foreigners should not be admitted by a judicial authority if the application is not accompanied by the "Certification of Legal Residence" issued by the Mexican Immigration Office.'

This information was received by the Court in a communication from the Mexican Embassy in Washington, D.C., Chief of the Consular Office, Juan Carlos Cue-Vega. In the correspondence, Mr. Cue-Vega further stated:

'Legal residence means when the Mexican Immigration Office had issued to the applicant whether the papers as alien resident of Mexico

or a special permit to have the right to file in Court if he were temporary resident. By resident it is meant when he had established his home within the territory of the Republic of Mexico or had resided therein for a minimum of six months before he is entitled to file for a divorce.'

"8 CAL. [FAM.LAW] CODE Section 4452, Section 4455 (West).

"9

'Q. Did you advise her to go to Tennessee to get one [a valid divorce]?

'A. I advised her to go anywhere she could to get the situation straightened out. Here again I'm practicing law and I didn't realize it.' Transcript, p. 34.

"10

'Q. And did you discuss with him [Mr. Williams] the validity of the Dominican divorce which you proposed to get for him?

'A. He wanted a non-consent divorce. His wife would not sign anything.... (T. 41).

'A. I would tell them that this is substantially a threat and that's all it is; just something to make the other side move.' (T. 42)."

McCloskey has filed no exceptions to the trial judge's findings of fact and conclusions of law.

Bar Counsel alleged, but apparently did not prove, that "Respondent operates a business obtaining over 1500 so-called 'divorces' a year for American citizens in the Dominican Republic." One may infer from the "800" telephone number in the national advertisement and from the printed material to which the trial judge alluded that the three incidents before the Court are not isolated cases. Be that as it may, what we have here is an attorney who has been found guilty of engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; of having published misleading or deceiving advertising; of having accepted employment so that a legal action might be brought for the purpose of harassing individuals; of having handled a legal matter which he knows or should know that he is not competent to handle without associating with him a lawyer who is competent to handle it; and of having acted contrary to a disciplinary rule in his representation of a client. We repeat that the trial judge said:

"[T]he Court is convinced that these ads misled the public in various jurisdictions that they would be dealing with an attorney who was prepared with knowledge of foreign

divorce law in every jurisdiction. Respondent is clearly in violation of Disciplinary Rule 2–101. The ads in question were deceptive, and created unjustified expectations in the minds of those who responded to them."

We have said many times that the purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney. *See, e.g., Attorney Griev. Comm'n v. Willemain,* 305 Md. 665, 680, 506 A.2d 245, 253 (1986); *Attorney Griev. Comm'n v. Shaffer,* 305 Md. 190, 204, 502 A.2d 502, 509 (1986); *Attorney Griev. Comm'n v. Truette,* 299 Md. 435, 446, 474 A.2d 211, 217 (1984); *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 684, 431 A.2d 1336, 1352 (1981). We are of the view that the public can best be protected from the type of conduct with which we are here concerned by permanently removing McCloskey from the Bar. It follows, therefore, that he shall be disbarred forthwith.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JAMES B. McCLOSKEY.

ELDRIDGE, Judge, dissenting:

The trial court in this case found that Bar Counsel had not shown "that there had been any previous complaints or grievances filed against the Defendant." The court also pointed out that the "demeanor of the Defendant before the Court was that of a remorseful person." The trial court went on to find that Mr. McCloskey "was completely candid in testifying before the Court" and cooperated with Bar Counsel. Most significantly, the trial court found

"that Mr. McCloskey has put himself in the predicament that he now finds himself because of poor judgment

rather than any willful intent to violate the Canons of Professional Responsibility."

Bar counsel has taken no exception to these findings.

In light of the trial court's findings in this case, I would impose a substantial suspension instead of disbarment.