844 A.2d 367

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Steven John POTTER.

Misc. Docket AG, No. 92 Sept. Term, 2002.

Court of Appeals of Maryland.

March 9, 2004.

Melvin Hirshman, Bar Counsel and Delores O. Ridgell, Asst. Bar Counsel for the Attorney Grievance Com'n of Maryland.

Andrew J. Graham, Baltimore, for Petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

RAKER, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a Petition for Disciplinary Action against Steven John Potter, alleging violations of the Maryland Rules of Professional Conduct. The Commission charged respondent with violating Maryland Rules of Professional Conduct 1.4 (Communication),[1] 1.7 (Conflict of interest),[2] and 8.4 (Misconduct).[3] Pursuant to Maryland Rule 16–752(a), we referred the matter to Judge Stuart R. Berger of the Circuit Court for Baltimore City to make findings of fact and proposed conclusions of law. Judge Berger held an evidentiary hearing and concluded that respondent had not violated any of the Rules.

---

1. Rule 1.4 provides as follows:
   "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

2. Rule 1.7 provides, in pertinent part, as follows:
   "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
   (1) the lawyer reasonably believes the representation will not be adversely affected; and
   (2) the client consents after consultation.
   (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved."

3. Rule 8.4 provides, in pertinent part, as follows:
   "It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   (d) engage in conduct that is prejudicial to the administration of justice."

I.

Judge Berger made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

"1. Respondent, Steven J. Potter, Esq. is 39 years old. He graduated from law school in 1989 and was admitted to the Maryland Bar in 1990. After completing a judicial clerkship, he began to practice law thereafter as an employee with the Law Office of Sheldon Braiterman, P.A. In February 1992, he left his employment at the Law Office of Sheldon Braiterman. From 1992–1997, the Respondent had his own practice. There is no evidence of any prior disciplinary complaints filed against the Respondent during his 13 year tenure as a member of the Maryland Bar.

"2. André R. Weitzman, Esq. has been a member of the Maryland Bar since 1979. From at least 1992 to the present, Mr. Weitzman has conducted his practice as a sole practitioner. *See* Tr., Afternoon Session, p. 11. From 1992 until July 1997, Mr. Weitzman and the Respondent had offices in the same building. During this time, Mr. Weitzman employed the Respondent as an independent contractor to work with him on some of Mr. Weitzman's cases. Mr. Weitzman and the Respondent had fee sharing agreements during that time period. From 1992 to July 1997, Mr. Weitzman and the Respondent did not have any disputes over those fee sharing agreements. *See* Tr., Afternoon Session, p. 32.

"3. During the period of July 1997 until on or about July 26, 2001, Mr. Potter was employed by the Law Offices of André R. Weitzman (hereinafter 'the law firm'). There is no writing reflecting the terms of Mr. Potter's employment with the Law Offices of André R. Weitzman. *See* Tr., Morning Session, p. 35. Mr. Weitzman testified that the terms of Mr. Potter's employment called for a salary of $3,500.00 a month. *See* Tr., Morning Session, p. 17 and Afternoon Session, p. 13.

"4. In addition, the Respondent believed he was entitled to a percentage of the net proceeds, if any, from the law firm. Further, under the verbal terms of Mr. Potter's employment, the Respondent received a percentage of the fees generated by cases he worked on for the firm. When the Respondent brought a client to the law firm, he received 50% of the fee generated by that client. After the fees were deposited into the law firm's bank account, the Respondent would receive his share of the fees, less withholding taxes, from Mr. Weitzman. *See* Tr., Morning Session, p. 39 and Afternoon Session, p. 17.

"5. While employed by Mr. Weitzman, the Respondent was provided an office in which to work. Mr. Potter kept the files he was working on for the law firm in that office. Mr. Weitzman testified that the Respondent was free to remove files from the office if he needed to go to court or to take a file home. It was Mr. Weitzman's custom to retain client files while the representation was active and for at least five years thereafter. *See,* Tr., Afternoon Session, pp. 25–26.

"6. Two of the clients that the Respondent brought to the law firm were Joseph Caldart (hereinafter 'Caldart') and Lorrie Kazmar (hereinafter 'Kazmar'). *See* Tr., Afternoon Session, pp. 20–22. Accordingly, Mr. Potter, not Mr. Weitzman, brought both the Caldart and Kazmar matters to the law firm. *See* Tr., Morning Session, pp. 36–38.

"7. The Caldart matter involved both a worker's compensation matter and a third-party claim. Mr. Caldart signed a form agreement entitled 'Power of Attorney and Contingent Fee Arrangement' on June 25, 1999 on the letterhead of the Law Offices of André R. Weitzman. *See* Joint Exhibit 21. The agreement calls for payment of a fee of 'one-third (33⅓) if terminated without suit' and 'one-third (33⅓) if suit is tried, of all amounts recovered by settlement or verdict' and reimbursement of advanced costs or as awarded by the Worker's Compensation Commission. *See* Joint Exhibit 21.

"8. Although the form agreement designates Mr. Weitzman as the attorney for the purpose of representing Caldart in connection with an 'attack by goat at Forward Visions on 6/14/99,' it was Mr. Potter, not Mr. Weitzman, who served as Caldart's attorney. *See* Tr., Afternoon Session, pp. 59–60. Indeed, Mr. Weitzman did not 'remember spending any time with Mr. Caldart,' and 'did not handle the case.' *See* Tr., Afternoon Session, pp. 59–60.

"9. Lorrie Kazmar signed an agreement entitled 'Power of Attorney and Contingent Fee Arrangement' dated May 12, 2000. *See* Joint Exhibit 17. The agreement states that Ms. Kazmar 'appoints André R. Weitzman and Steven J. Potter as Attorneys for the purpose of representing [her] in connection with all claims and cases of action arising out of [her] contracting mesothelioma, and other illness related to her exposure to asbestos.' *See* Joint Exhibit 17.

"10. The Kazmar agreement calls for a fee of 'one-third (33⅓%) if terminated without suit' and 'one third (33⅓%) if suit is tried, of all amounts recovered by settlement or verdict and reimbursement to said Attorney for expenses advanced including Court costs.' *See* Joint Exhibit 17. Ms. Kazmar died during the representation, and Barbara St. John, as personal representative for her estate, entered into a similar agreement on behalf of the estate. *See* Joint Exhibit 18.

"11. Although both Messrs. Weitzman and Potter were formerly retained in the 'Power of Attorney and Contingent Fee Agreement,' Mr. Potter, not Mr. Weitzman, served as the attorney for Ms. Kazmar, and thereafter, her estate. Indeed, Mr. Potter interviewed Ms. Kazmar 'extensively,' while Mr. Weitzman poked his head in and said hello. *See* Tr., Morning Session, p. 38.

"12. The clear and convincing evidence elicited at the hearing demonstrates that Mr. Potter provided the legal services to the clients on behalf of the law firm regarding both the Caldart and Kazmar matters. *See,* Tr., Afternoon Session, pp. 20–23 and 59–60.

"13. Respondent elected to leave his employment with the Law Offices of André R. Weitzman for several reasons

including, but not limited to, the fact the Respondent believed that Mr. Weitzman had not lived up to their agreement as to Mr. Potter's share of the profits for 2000, and because Mr. Weitzman had hired an inexperienced attorney and paid him the same as he paid the Respondent. *See* Tr., Morning Session, p. 99. The Respondent also thought his salary was too low and he did not always agree with Mr. Weitzman's methods of operation. *See* Tr., Morning Session, p. 99.

"14. On July 26, 2001, the Respondent advised Mr. Weitzman that he was resigning from his employment effective immediately. *See* Tr., Afternoon Session, pp. 24–25. The Respondent did not provide advance notice of his resignation to Mr. Weitzman because he feared that Mr. Weitzman would take action to interfere with and prejudice the best interests of the clients who Mr. Potter brought to the law firm. *See* Tr., Morning Session, pp. 128–29.

"15. Mr. Potter did not communicate with any client, including Joseph Caldart or Barbara St. John, concerning his intention to resign from his employment with the law firm until his resignation was effective. Mr. Potter refrained from telling any client that he was leaving the law firm until after he left, out of a concern not to breach any duty of loyalty that he might have to his employer. *See* Tr., Morning Session, pp. 74 and 100.

"16. Mr. Potter did not solicit any of the clients of the law firm before he resigned from his employment. *See* Tr., Morning Session, p. 100. Indeed, Mr. Weitzman acknowledged that 'none of the clients suffered . . .' because of Mr. Potter's departure from the law firm. *See* Tr., Afternoon Session, p. 39.

"17. Joseph Caldart terminated his contingency fee agreement with the Law Offices of André R. Weitzman on or about July 27, 2001 and entered into a new fee agreement with Mr. Potter at that time. *See* Tr., Morning Session, pp. 71–73; *See* Joint Exhibits 16, 22. The letter written to Mr. Weitzman notes that '[i]f there are any expenses arising from Mr. Potter's representation of [Mr. Caldart] for which

you are requesting reimbursement, please forward your request with supporting documentation to Mr. Potter.' *See* Joint Exhibit 16.

"18. Barbara St. John, the personal representative of the Estate of Lorrie Kazmar terminated all contingency fee agreements between Ms. Kazmar, Ms. St. John, the Estate of Lorrie Kazmar and the Law Offices of André R. Weitzman on or about August 31, 2001. Ms. St. John, as personal representative of the Estate of Lorrie Kazmar, entered into a new fee agreement with Mr. Potter as did the Estate's trial counsel in New York. *See* Tr., Morning Session, pp. 75–76, 96; *See* Joint Exhibits 19, 20. The letter is silent as to the contingency fee agreement or the costs advanced by the Law Offices of André R. Weitzman in the Kazmar matter. Joint Exhibit 20.

"19. The clear and convincing evidence demonstrates that the clients who followed Mr. Potter when he left the Law Office of André R. Weitzman, for all practical purposes, did not know Mr. Weitzman. *See* Tr., Morning Session, P. 124; Tr., Afternoon Session, pp. 58–60. As a result, Mr. Potter had every reason to believe that both the Caldart and Kazmar clients would elect to have him continue his representation if he left the Law Offices of André R. Weitzman. *See* Tr., Morning Session, pp. 123–24.

"20. The Respondent believed that he would need the client files relating to the Caldart and Kazmar matters to continue to represent them properly. Mr. Potter believed that if he did not take possession of the files relating to the Caldart and Kazmar matters, Mr. Weitzman would withhold the files or take other action, thereby impairing the Respondent's ability to represent the clients and otherwise impede the progress of the clients' cases. Mr. Potter anticipated that Mr. Weitzman would forcibly retain possession of the clients' files in order to obtain a financial share from the proceeds of any recovery in excess of the amount of any *quantum meruit* to which Mr. Weitzman might be entitled. *See* Tr., Morning Session, pp. 93–94; Tr., Afternoon Session, p. 9; Exhibits 12, 13 and 14.

"21. The Respondent also took a file relating to a bankruptcy matter involving Marlene King. Although Mr. Weitzman retained both the unearned attorneys' fees and the advance filing fee in the King case, Mr. Potter prepared and filed the case for Mrs. King and handled it to its conclusion for her without additional compensation or cost to Mrs. King. *See* Tr., Morning Session, p. 129.

"22. The clients' files that Mr. Potter took with him from the Law Offices of André R. Weitzman were maintained intact. Copies were supplied to Bar Counsel. The clear and convincing evidence at the hearing demonstrates that no part of the contents of those files has been lost or destroyed. *See* Tr., Morning Session, pp. 121–22.

"23. At the time of the hearing before the Circuit Court for Baltimore City, some twenty-two months after Mr. Potter's resignation from his employment with the Law Offices of André R. Weitzman, the Caldart and Kazmar cases remain pending, although settlement in Caldart is represented to be likely. The Caldart case was not filed in the Circuit Court for Baltimore County until after Mr. Potter resigned from the Law Offices of André R. Weitzman. *See* Tr., Morning Session, p. 134. The discovery proceedings in the Kazmar case did not begin until after Mr. Potter resigned from the law firm.

"24. Prior to his departure from the law firm, the Respondent accessed the firm's computer and deleted the files maintained on the computers for the Caldart and Kazmar matters. *See* Tr., Afternoon Session, pp. 27–28. The computer records included all documents prepared by the Respondent and/or the firm's secretaries relating to these two matters. *See* Tr., Afternoon Session, p. 29.

"25. After Mr. Potter's departure, André Weitzman wrote a letter to Mr. Caldart threatening Mr. Caldart with a lawsuit unless Mr. Potter made 'suitable arrangements under the employment contract for a payment of a percentage of the fee earned in [the] case.' *See* Joint Exhibit 10. Mr. Weitzman also sent a letter to the law firm engaged to represent the Estate of Lorrie Kazmar advising the law

firm that the Law Offices of André R. Weitzman 'maintains a proprietary interest in the payment of a fee in th[e] case and a lien.' *See* Joint Exhibit 11. Mr. Weitzman made similar claims to the employer/insurer's defense counsel, the insurer's adjusting agents, the third party insurer's agents and the third party defendant's counsel. *See* Joint Exhibits 8, 9 and 11.

"26. After resigning from the Law Offices of André R. Weitzman, Mr. Potter acted appropriately by securing counsel (Brian Parker, Esq.) to advise him and represent him on any legal and ethical issues that arose from his departure from the Law Offices of André R. Weitzman, as well as to attempt, in good faith, to resolve any and all disputes with Mr. Weitzman. *See* Tr., Morning Session, pp. 77, 104; Tr., Afternoon Session, pp. 71–72.

"27. Mr. Potter, through competent counsel, Brian Parker, Esq. attempted, responsibly, to address with Mr. Weitzman all pending client matters relating to clients of the law firm, as well as the division of potential attorneys' fees from the Caldart and Kazmar cases. *See* Tr., Afternoon Session, pp. 74–77; *See* Joint Exhibits 4, 5. Notwithstanding Mr. Parker's credible efforts to resolve the disputes by and between Mr. Potter [sic] and Mr. Weitzman, Mr. Weitzman refused to resolve his differences with Mr. Potter.

"28. Mr. Weitzman filed his grievance against Mr. Potter on October 16, 2001, only after repeatedly threatening Mr. Potter's attorney (Brian Parker, Esq.), that he would do so if Mr. Potter did not agree to the terms of Mr. Weitzman's financial demands. *See* Tr., Afternoon Session, p. 78; *See* Joint Exhibits 1, 36.

"29. After Mr. Parker's efforts proved unproductive, Norman Smith, Esq. assumed the role of counsel to Mr. Potter. The threats from Mr. Weitzman continued including Mr. Weitzman's representation that he would initiate criminal proceedings against Mr. Potter for theft if Mr. Potter did not acquiesce to Mr. Weitzman's financial demands. *See* Tr., Afternoon Session, pp. 75, 81, 92 and 97.

"30. Only after Mr. Weitzman was unable to achieve the fee-sharing agreement that he proposed did Mr. Weitzman file, according to Mr. Parker, his complaint against Mr. Potter with the Attorney Grievance Commission. *See* Tr., Afternoon Session, p. 78; *See* Joint Exhibits 12, 13 and 14.

"31. According to the credible testimony of Messrs. Parker and Smith, the Respondent was willing to resolve the financial dispute with Mr. Weitzman on terms they both thought were generous to Mr. Weitzman. Mr. Weitzman's hostility towards Mr. Potter in his communications with Messrs. Parker and Smith prevented a settlement from occurring. *See* Tr., Afternoon Session, pp. 76, 88, 91; *See* Joint Exhibits 5, 13 and 14.

"32. Notwithstanding the fee dispute between Mr. Weitzman and the Respondent, Mr. Potter reimbursed Mr. Weitzman for all funds advanced by the Law Offices of André R. Weitzman for expenses associated with the Caldart and Kazmar litigation. *See* Tr., Morning Session, p. 105; *See* Joint Exhibit 32, 33.

"33. The Respondent acknowledged reviewing the financial records of the Law Offices of André R. Weitzman for the year 2000. Mr. Weitzman considered these reports to be his private records. *See* Tr., Afternoon Session, P. 51. The entries on the reports include deposits from Mr. Weitzman's personal accounts, which he used to pay firm salaries and expenses. The reports also contained disbursements for personal expenses. *See* Tr., Afternoon Session, pp. 48–50.

"34. The Respondent maintains that he reviewed the financial summaries to determine whether there were any profits in which he had a right to share. Mr. Weitzman had advised Mr. Potter that the law firm had no profits in 2000, but the firm's accountant informed Mr. Potter that there were profits. *See* Tr., Morning Session, pp. 46, 47, 102.

"35. Mr. Weitzman did not tell Mr. Potter he could not look at the financial summaries of the law firm. *See* Tr., Morning Session, p. 50. If the Respondent had asked, Mr. Weitzman might have shown the reports to the Respondent

and given an explanation. *See* Tr., Morning Session, pp. 42, 50. Indeed, Mr. Weitzman had offered Mr. Potter the opportunity to review the law firm's records in the past. *See* Tr., Morning Session, pp. 46, 120. The Court finds that the Respondent's actions in reviewing the records were reasonable inasmuch as he believed he was entitled to a percentage of the law firm's net proceeds as part of the verbal employment agreement arrived at between him and his employer.

### CONCLUSIONS OF LAW

"The Petition for Disciplinary Action filed in the Court of Appeals alleges that the Respondent violated Maryland Rules of Professional Conduct 1.4, 1.7(b) and (c) and 8.4(a), (b), (c) and (d). Rule 1.4, entitled 'Communication' provides that:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding representation.

This Court finds that Bar Counsel has not demonstrated that the Respondent violated Rule 1.4 concerning client communication. Bar Counsel has not sustained its burden of proof because it did not show, by clear and convincing evidence, that any client represented by Mr. Weitzman or Mr. Potter was not kept 'reasonably informed of the status' of his or her matter. Further, Bar Counsel did not offer any evidence whatsoever that any client made a reasonable request for information with which Mr. Potter failed to comply.

"The Petitioner maintains that the letters Respondent wrote on behalf of Mr. Caldart and Ms. St. John 'indicate that the clients were not aware of their obligations to [Mr.] Weitzman.' *See* Petitioner's Proposed Findings of Fact and Conclusions of Law at 20; *See* Joint Exhibits 16 and 20.

Respectfully, there is nothing in either letter, or in any communication satisfying Bar Counsel's burden to show that the Respondent failed to keep his clients reasonably informed about the status of a matter or failed to explain a matter to the extent reasonably necessary to permit any client to make any informed decision regarding their representation.

"Clearly, no client testified in these proceedings. Although direct testimony from a client is unnecessary to establish a violation of Maryland Rule of Professional Conduct 1.4, there must be clear and convincing evidence to establish such a violation. Bar Counsel did not adduce clear and convincing evidence that either Mr. Caldart or Ms. St. John lacked the information necessary to make a decision as to which attorney they wanted to represent them. Indeed, the clients who followed Mr. Potter when he left the Law Offices of André R. Weitzman, for all practical purposes, were represented by Mr. Potter throughout the course of their representation at the Law Offices of André R. Weitzman. As a result, the matters involving Mr. Caldart and the Estate of Lorrie Kazmar remained with Mr. Potter after he left his employment with Mr. Weitzman.

"Further, this Court finds that Bar Counsel has not established by clear and convincing evidence that any of Mr. Potter's actions violated Maryland Rule of Professional Conduct 1.7(b) or (c) concerning conflicts of interest. Maryland Rule of Professional Conduct 1.7(b) and (c), entitled 'Conflict of Interest: General Rule' provides that:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's re-

sponsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.

Bar Counsel contends that the Respondent acted solely in his own interest when he denied Weitzman access to the files and other information concerning the representation thereby involving the clients in his dispute with [Mr.] Weitzman.' *See* Petitioner's Proposed Findings of Fact at 20–21. The clear and convincing evidence elicited at the hearing demonstrates that Mr. Potter's representation of Mr. Caldart and the Estate of Lorrie Kazmar was [sic] not materially limited by Mr. Potter's self-interest.

"There is no allegation during these proceedings that Mr. Potter did not represent competently his clients, including Mr. Caldart and the Estate of Lorrie Kazmar. Further, there is no evidence in the record that Mr. Potter took advantage of—or even attempted to take advantage of—any client in any way. On the contrary, the clear and convincing evidence before this Court is that each client consented to Mr. Potter's continued representation after appropriate consultation.

"The Respondent is also charged with violating Rule 8.4(a), (b), (c) and (d) of the Maryland Rules of Professional Conduct. Rule 8.4 entitled 'Misconduct' provides that:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice . . . .

"This Court finds that Bar Counsel has not established by clear and convincing evidence that Mr. Potter's actions violated Maryland Rules of Professional Conduct 8.4(a), (b),

(c) or (d). With regard to the allegations of a Rule 8.4(a) violation, for the reasons stated *supra* at pp. 131–42 and *infra* at pp. 143–51, this Court does not find by clear and convincing evidence that Mr. Potter has violated or has attempted 'to violate the Rules of Professional Conduct.' Further, there is no allegation that Mr. Potter knowingly assisted or induced anyone to violate the Rules of Professional Conduct or did so through anyone else. As a result, this Court finds that Bar Counsel has not demonstrated that the Respondent violated Rule 8.4(a) of the Maryland Rules of Professional Conduct.

"Rule 8.4(b) of the Maryland Rules of Professional Conduct provides that:

It is professional conduct for a lawyer to:

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

"The Court finds that Petitioner has failed to demonstrate through clear and convincing evidence, that Mr. Potter committed 'a criminal act that reflected adversely on his honesty, trustworthiness or fitness as a lawyer in other respects.' The Court acknowledges that it is not necessary for the Respondent to be charged or convicted of the criminal offense in order to find a violation of Rule 8.4(b) of the Maryland Rules of Professional Conduct. *See Attorney Grievance Commission v. Garland*, 345 Md. 383, 394–95, 692 A.2d 465 (1997) (holding that there is no requirement that the Respondent be charged with or prosecuted for the criminal offense to find a violation of Rule 8.4(b) of the Maryland Rules of Professional Conduct; all that is required is proof of the underlying conduct by clear and convincing evidence). Nevertheless, based on clear and convincing evidence, the Court finds that Respondent has not committed a criminal act that reflects adversely on his honesty, trustworthiness or fitness as a lawyer in other respects.

"Petitioner attempts to show that Mr. Potter violated Section 7–104(a) of the Maryland Theft Statute when he

deprived Mr. Weitzman of the paper and computer generated materials relating to the Caldart and Kazmar matters. Section 7–104(a) provides, in relevant part, that:

A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person:

- intends to deprive the owner of the property;

- willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

- uses, conceals, or abandons the property knowing the use, concealment or abandonment probably will deprive the owner of the property.

Md. Code Ann., Criminal Law § 7–104(a) (2002). The Court finds that under the facts and circumstances of this case, Respondent lacked any intent to deprive Mr. Weitzman of client files and computer records. The client files were kept intact at all times; no part of any file has been lost or destroyed. The Court further finds that while Respondent's deletion of computer records may have been inappropriate and improper, Petitioner has failed to demonstrate by clear and convincing evidence, that the deletion of computer records under the facts and circumstances of this case constitute[s] a criminal act that reflected adversely on his honesty, trustworthiness or fitness as a lawyer in other respects.

"Mr. Potter reasonably believed that the clients would follow him after leaving Mr. Weitzman's firm. *See* Findings of Fact, *supra*, p. 136–37. At all times, Respondent did what he believed was in the best interests of his clients. Indeed, had the clients instructed him to do so, Respondent would have transferred the files back to Mr. Weitzman. *See* Tr., Morning Session, p. 119. Under the facts and circumstances of this case, the Court finds that Mr. Potter did not commit a criminal act. Further, because this Court finds that Mr. Potter acted solely in his clients' best interests, the Court finds that Petitioner [sic] has failed to show that Mr.

Potter acted in any way that reflected adversely on his honesty, trustworthiness or fitness as a lawyer.

"Further, the Petitioner has failed to demonstrate that the Respondent's conduct constituted fraudulent misappropriation by a fiduciary. Pursuant to Md. Code Ann., Criminal Law § 7–113 (2002), it is prohibited for a fiduciary to:

- fraudulently and willfully appropriate money or a thing of value that the fiduciary holds in a fiduciary capacity contrary to the requirements of the fiduciary's trust responsibility; or
- secrete money or a thing of value that the fiduciary holds in a fiduciary capacity with a fraudulent intent to use the money or thing of value contrary to the requirements of the fiduciary's trust responsibility.

For the reasons set forth above, the Court finds that Petitioner has failed to show, through clear and convincing evidence, that Respondent violated Section 7–113. Under the facts and circumstances of this case, Mr. Potter acted in the sole interests of his clients. Accordingly, this Court finds that Petitioner has failed to establish, by clear and convincing evidence, that Respondent fraudulently misappropriated any files or computer records or any other thing of value in violation of Section 7–113. Indeed, all of the files were maintained intact and copies provided to Bar Counsel. Accordingly, Petitioner has failed to demonstrate by clear and convincing evidence that Respondent violated Rule 8.4(b) of the Maryland Rules of Professional Conduct.

"Rule 8.4(c) of the Maryland Rules of Professional Conduct provides that:

It is professional misconduct for a lawyer to:

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

"For the reasons stated *supra* at 140–44 and *infra* at pp. 145–51, this Court does not find, by clear and convincing evidence, that Mr. Potter engaged in conduct involving dishonesty, fraud, deceit or misrepresentation. While it is undisputed that Mr. Potter removed files and deleted com-

puter records, he did so in order to represent competently the clients, not to be dishonest or deceitful. Mr. Potter's actions served solely to protect his clients' interests. While the Court does not condone Mr. Potter's actions, this Court finds that Mr. Potter did not violate Rule 8.4(c) of the Maryland Rules of Professional Conduct under the facts and circumstances of these matters. Mr. Potter reasonably believed that both the Caldart and Kazmar clients would choose to have him continue his representation if he terminated his employment with Mr. Weitzman. *See* Findings of Fact, p. 136–37. As such, Mr. Potter did what he thought was in the best interests of his clients. Further, Mr. Potter believed that if he did not take possession relating to the Caldart and Kazmar matters, Mr. Weitzman would withhold the files or take other action thereby impairing the Respondent's ability to represent the clients and otherwise impede the clients' cases.

"Petitioner directs the Court's attention to three separate cases wherein courts found an attorney in violation of Rule 8.4(c) of the Maryland Rules of Professional Conduct. *See Attorney Grievance Commission v. Kahn*, 290 Md. 654, 431 A.2d 1336 (1981); *In re Complaint as to the Conduct of Corey B. Smith*[, 315 Or. 260], 843 P.2d 449 (Or.1992); *In the Matter of Gary M. Cupples*, 952 S.W.2d 226 (Mo.1997). However, the facts of these cases are distinguishable from the facts presented to this Court.

"In *Kahn*, the Respondent secretly removed and photocopied many office records from his boss's firm for the express purpose of taking inventory and evaluating the firm's open cases as a basis for a financial settlement with his boss for the transfer of the firm to Respondent. *Kahn, supra*, 290 Md. at 660, 431 A.2d 1336. The information Respondent misappropriated was used for the Respondent's own financial benefit. *Id.* at 676[, 431 A.2d 1336]. Further, the Respondent paid 'runners' to solicit people involved in automobile accidents to go to the firm where the Respondent worked. *Id.* at 663–64[, 431 A.2d 1336].

"The hearing Court found that Respondent used false and fraudulent medical reports and bills for medical services as proof of damages in claims for personal injuries. *Id.* at 672[, 431 A.2d 1336]. The Respondent in *Kahn* committed highly egregious acts which were solely for the purpose of enhancing his personal financial status. In the case *sub judice,* the clear and convincing evidence demonstrates that the Respondent acted in his clients' best interests and not for his own financial purpose. Indeed, the Respondent attempted, in good faith, to address with Mr. Weitzman the division of potential attorneys' fees from the Caldart and Kazmar cases, which Mr. Weitzman refused to resolve. *See* Findings of Fact, *supra,* pp. 138–39.

"In *Smith, supra,* 843 P.2d 449, the Respondent met 31 new clients in his office and had each sign individual retainer agreements in violation of the firm's requirement to only use retainer agreements for representation by the Respondent's firm. *Smith, supra,* 843 P.2d at 450. The Respondent did not open new firm files for any of the 31 new clients. *Id.* Upon leaving the firm, the Respondent took with him the files relating to all 31 of these clients as well as 50 to 75 other cases. *Id.* at 450–51.

"Thereafter, the Respondent mailed letters to the 31 new clients announcing his opening of a new law office under a different name yet continuing to do the same work. Additionally, Respondent mailed letters to opposing counsel, insurance companies, medical providers, and workers' compensation referees involved in the 31 matters notifying them of the changed address and law firm name. Further, only after the Respondent's firm filed civil actions against the Respondent, did the Respondent inform the 31 clients that they had a choice whether to be represented by the Respondent or the firm. The hearing Court found that 'before the 31 new clients signed the individual retainer agreements, the [Respondent] anticipated leaving [his firm]; that he intended to keep these clients as his own if and when he left [the firm]; and that he therefore consciously kept the 31 new clients out of the [firm's] file system.' *Id.* at 451. The

Court found that such conduct clearly involved dishonesty, fraud, deceit, or misrepresentation as prohibited by the Rules of Professional Conduct.

"According to the Court in *Smith*, the letters from the accused to the 31 clients included misrepresentations to the clients; the letters from the accused to opposing counsel, insurance companies, medical providers, and workers' compensation referees included misrepresentations to the public; and the surreptitious handling of the client files was dishonest and deceitful toward the firm. *Id.* In the present case, Mr. Potter made no such misrepresentations either to his clients, Mr. Weitzman, or other relevant parties; Mr. Potter consulted with his clients regarding his departure from the Law Offices of André R. Weitzman. *See supra*, pp. 135–36. Further, the extent to which the Respondent in the *Smith* case concealed new clients from the firm and misappropriated numerous files involving numerous clients is a far cry from Mr. Potter's actions. Mr. Potter never concealed the Caldart and Kazmar matters from Mr. Weitzman; Mr. Potter openly brought these matters with him to the Law Offices of André R. Weitzman. *See* Findings of Fact, *supra*, p. 134. Bar Counsel's attempt to compare the Respondent's deplorable conduct in *Smith* is misplaced. As stated previously, Mr. Potter's conduct flowed from his feeling of responsibility to his clients. Under the facts and circumstances of this case, Mr. Potter's actions are distinguished from the Respondent's actions in *Smith*.

"In *Cupples, supra*, 952 S.W.2d 226, the Respondent, a partner in a law firm, secreted 18 clients by failing to register these clients in a billing system in preparation to withdraw from the law firm. *See Cupples, supra*, 952 S.W.2d 226. The Respondent also failed to turn over particular cases that he had received but that would not have been assigned to him by the firm's alphabetical system. *Id.* at 229. Additionally, the Respondent failed to report work on these particular cases during weekly meetings with his co-partners of the firm. *Id.* When the Respondent's part-

ners discovered his deceitfulness, Respondent 'at best, was not forthright about his intent to withdraw from the firm and not forthcoming with cooperat[ing] with the firm.' *Id.* at 238. The Court found that the Respondent's actions 'violated his duties to the firm.' *Id.* As stated previously, the clear and convincing evidence demonstrates that Mr. Potter acted solely in the interests of his clients. Unlike the Respondent in *Cupples,* Mr. Potter's motivating factor in his actions was not to deceive and defraud, but to protect the clients.

"Accordingly, this Court finds that Mr. Potter has not engaged in conduct involving dishonesty, fraud, deceit or misrepresentation. Accordingly, Petitioner has failed to demonstrate by clear and convincing evidence that Mr. Potter has violated Rule 8.4(c) of the Maryland Rules of Professional Conduct.

"Rule 8.4(d) of the Maryland Rules of Professional Conduct provides that:

It is professional misconduct for a lawyer to:

(d) engage in conduct that is prejudicial to the administration of justice.

"The Petitioner alleges that Mr. Potter's action constitutes conduct that is prejudicial to the administration of justice. Clearly, public confidence in the legal profession is a critical facet to the proper administration of justice. Conduct that erodes public confidence is viewed properly as prejudicial to the administration of justice. It is well settled that 'an attorney occupies a high position of trust with his client, and that an attorney must exercise the utmost good faith, fairness and fidelity toward the client.' *See Littell v. Morton,* 369 F.Supp. 411, 425 (D.Md.1974), *aff'd,* 519 F.2d 1399 (4th Cir.1975); *see also Homa v. Friendly Mobile Manor,* 93 Md.App. 337, 346–47, 612 A.2d 322 (1992) (stating that the fiduciary relationship which exists between an attorney and client carries with it the duty of loyalty and utmost good faith).

"For the reasons stated *supra*, pp. 140–48, this Court finds that the Petitioner has failed to demonstrate, by clear and convincing evidence, that the Respondent engaged in conduct that is prejudicial to the administration of justice. The clear and convincing evidence introduced at the hearing is that the Respondent's actions with regard to the matters involving Mr. Caldart and the Estate of Lorrie Kazmar were undertaken to foster what the Respondent believed was in the best interests of the clients. As the Petitioner readily acknowledges, there were no clients prejudiced by the Respondent's conduct. *See* Petitioner's Proposed Findings of Fact and Conclusions of Law at ——. Clearly, the lack of prejudice to the clients is not dispositive. Nevertheless, the fact that no client suffered as a result of Mr. Potter's actions is a factor in considering whether Mr. Potter's actions constitute 'conduct prejudicial to the administration of justice.'

"Moreover, Mr. Potter, not Mr. Weitzman, brought both the Caldart and Kazmar matters to the Law Offices of André R. Weitzman. Further, Mr. Potter provided the legal services to the clients on behalf of Mr. Weitzman's law firm regarding both the Caldart and Kazmar matters. As a result, Mr. Potter has every reason to believe that both the Caldart and Kazmar clients would elect to continue his representation if he left the Law Offices of André R. Weitzman.

"Although this Court neither countenances nor condones the taking of files and the deletion of computer records, the client files that Mr. Potter took with him from the Law Offices of André R. Weitzman were maintained intact. The clear and convincing evidence from the hearing demonstrates that no part of the contents of those files has been lost or destroyed. Further, notwithstanding the fee dispute between Mr. Weitzman and Mr. Potter, the Respondent has reimbursed Mr. Weitzman for all funds advanced by the Law Offices of André R. Weitzman for expenses associated with the Caldart and Kazmar litigation.

"Accordingly, under the facts and circumstances of this case, this Court finds that the Petitioner has failed to demonstrate that the Respondent engaged in 'conduct that is prejudicial to the administration of justice.' As a result, this Court finds that the Petitioner has failed to prove, by clear and convincing evidence, that the Respondent violated Rule 8.4(d) of the Maryland Rules of Professional Conduct.

"For these reasons, the Court finds that the Petitioner has failed to demonstrate, by clear and convincing evidence, that the Respondent violated Rule 1.4, Rule 1.7(b) and (c) and Rule 8.4(a), (b), (c) and (d) of the Maryland Rules of Professional Conduct."

Respondent does not except to the trial judge's findings of fact or conclusions of law. In fact, he urges this Court to accept the findings and to dismiss the charges.

Bar Counsel excepts to the hearing judge's conclusions of law that respondent's conduct did not violate Maryland Rules of Professional Conduct 8.4(b), (c), and (d). We shall sustain each of Bar Counsel's exceptions.

## II.

This Court has original jurisdiction over attorney disciplinary proceedings. *See Attorney Grievance Comm'n v. Harris*, 371 Md. 510, 539, 810 A.2d 457, 474 (2002). In the exercise of our obligation, we conduct an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous. *See Attorney Grievance Comm'n v. Garfield*, 369 Md. 85, 97, 797 A.2d 757, 763–64 (2002). The factual findings of the hearing judge will not be disturbed if they are based on clear and convincing evidence. *See* Md. Rule 16–757(b) (providing that Bar Counsel has burden of establishing averments of the petition by clear and convincing evidence); *Attorney Grievance Comm'n v. Monfried*, 368 Md. 373, 388, 794 A.2d 92, 100 (2002). We consider the hearing judge's proposed conclusions of law *de novo*. *See Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

Bar Counsel excepts to the hearing judge's conclusion that respondent's conduct did not violate Maryland Rules of Professional Conduct 8.4(b), (c), and (d). The hearing judge erred as a matter of law and we sustain Bar Counsel's exceptions. Respondent's conduct was criminal conduct that reflected adversely on his honesty, trustworthiness, and fitness as a lawyer; it was deceitful and was conduct prejudicial to the administration of justice.

Respondent engaged in criminal conduct by deleting the client files from the computer when he was not authorized to do so. We find by clear and convincing evidence that respondent's conduct in deleting the computer records violated Maryland Code (2002, 2003 Cum. Supp.) § 7–302 of the Criminal Law Article, which provides, *inter alia*, that a person may not intentionally and willfully exceed that persons's authorized access to a computer with the intent to "alter, damage, or destroy all or any part of data or a computer program stored, maintained, or produced by a computer." [4]

Respondent exceeded his authorized use of the law firm's computer system in violation of § 7–302(c)(1) and he also did so with the intent to alter and destroy part of the data stored by that computer system in violation of § 7–

---

4. Maryland Code (2002, 2003 Cum. Supp.) § 7–302 of the Criminal Law Article, entitled "Unauthorized access to computers and related material," provides, in pertinent part:

"(c) Prohibited.—(1) A person may not intentionally, willfully, and without authorization access, attempt to access, cause to be accessed, or exceed the person's authorized access to all or part of a computer network, computer control language, computer, computer software, computer system, computer services, or computer database.

(2) A person may not commit an act prohibited by paragraph (1) of this subsection with the intent to:

(i) cause the malfunction or interrupt the operation of all or any part of a computer, computer network, computer control language, computer software, computer system, computer services, or computer data; or

(ii) alter, damage, or destroy all or any part of data or a computer program stored, maintained, or produced by a computer, computer network, computer software, computer system, computer services, or computer database."

302(c)(2)(ii). Respondent's deletion of the computer records constituted criminal conduct.[5] Such conduct also reflected adversely upon his honesty and trustworthiness. Respondent was authorized to use the law firm's computers to generate and store documents relating to client matters. He did not have permission, however, to delete these computer records without the consent of his employer. Respondent's fear that Mr. Weitzman would interfere with his continued representation of the Caldart and Kazmar clients after respondent left the law firm did not authorize him to destroy the firm's computer records relating to those clients. Respondent deleted the computer records at 1:00 or 2:00 a.m. on July 11, 2001, two weeks before respondent planned to quit his employment with the Law Offices of Andre' Weitzman. This surreptitious conduct in the middle of the night is strong evidence that respondent knew that his conduct was unauthorized.

In addition to deleting the computer records, respondent removed all files from the law firm relating to the Caldart and Kazmar matters. The hearing judge concluded that respondent did not violate Rule 8.4 because he was acting in the clients' interests. In finding no violation of Rule 8.4, the hearing judge focused on respondent's motive, rather than on his intent. For example, the hearing judge determined that, based on respondent's motive of protecting the clients' interests, respondent did not remove the files or delete the computer records "to be dishonest or deceitful." The hearing judge erred in concluding that the removal of the files was not a violation of Rules 8.4(c) and (d). Regardless of respondent's motive, *i.e.*, his purported desire to protect the interests of the clients, his conduct was dishonest and deceitful. As we have indicated, respondent had no authority to delete the records, and he knew that he had no such authority.

---

**5.** We do not address whether respondent, as an associate of the law firm, owed the firm a fiduciary obligation. Suffice it to say, departing attorneys should not take paper files from the law firm when they are unauthorized to do so.

Respondent's unauthorized removal of the client files violated Rules 8.4(c) and (d). At the time respondent removed the client files, he did not have the authorization of the law firm or the clients. Although respondent's belief that Caldart and Kazmar would choose ultimately to have him continue to provide legal services for them, they did not give respondent permission to remove their files nor could they have given him such permission while he was employed with the firm. Respondent acted dishonestly and in an untrustworthy manner in exceeding the scope of his authority, appropriating files, and deleting computer records.

■ It is important to note that we are not focusing on the solicitation of clients by a departing associate or partner of a law firm. The conduct in question in the instant case is the removal of files by a lawyer without the knowledge of the law firm. It appears that such conduct is uniformly condemned as highly improper and unethical. One partner has a fiduciary duty to another partner. *Herring v. Offutt,* 266 Md. 593, 597, 295 A.2d 876, 879 (1972); Md. Code (1975, 1999 Repl. Vol., 2003 Cum. Supp.) § 9A–404 of the Corporations and Associations Article. Similarly, under the law of agency, there exists a fiduciary relationship between a law firm and its associate lawyers. *Insurance Co. v. Miller,* 362 Md. 361, 381–83, 765 A.2d 587, 598–99 (2001). *See also, e.g.,* V. Johnson, *Solicitation of Law Firm Clients by Departing Partners and Associates: Tort, Fiduciary, and Disciplinary Liability,* 50 U. Pitt. L.Rev. 1 (1988). Professor Johnson noted:

> "[U]nauthorized removal of client files appears certain to be regarded as a breach of fiduciary duties, for throughout all of the literature on attorney conduct, such conduct is uniformly condemned. Indeed, even where the attorney acts out of fear that former partners will refuse to turn over files at the client's request, unconsented removal has been deemed improper."

*Id.* at 109 (citing *Attorney Grievance Comm'n v. Kahn,* 290 Md. 654, 431 A.2d 1336 (1981)). *See also Meehan v. Shaughnessy,* 404 Mass. 419, 535 N.E.2d 1255, 1265 (1989) (stating

that where several partners and an associate took improper and preemptive steps to remove cases from their law firm in preparation to start their own firm, the attorney associate, by occupying a position of trust and confidence, owed and violated the same duty of loyalty to the partnership that the partners owed and violated).

In *Kahn, supra,* 290 Md. 654, 431 A.2d 1336 (1981), we held that by removing and photocopying records summarizing client files, in anticipation of future representation of clients as a result of the disbarment of the sole partner in the firm, the associate acted illegally, unethically, and in violation of DR 1–102, the analog to Rules 8.4(c) and (d). In *Kahn,* the attorney's former employer had been disbarred after pleading guilty in federal court to a charge of mail fraud. Thereafter, the attorney, Kahn, and his former employer, Berman, allegedly discussed transferring Berman's law practice to Kahn. Kahn testified before the hearing judge in the disciplinary action that he removed and photocopied index cards relating to the cases on which he and another associate had been working in order to place a value on those cases as a basis for a financial agreement with Berman for the transfer of the practice. The hearing judge found, however, that Kahn used the information he had copied from the case files to recreate files for former firm clients who chose to continue to receive his legal services. The hearing judge made the following findings of fact:

> "[A]s a salaried employee of Berman, [Kahn] acquired no property interest or claim of right in the information contained in Berman's office files at the time of Berman's disbarment. Consequently, the removal and photocopying of Berman's records summarizing the contents of Berman's office files was an illegal appropriation of the information contained therein. Whether this information was useful in attempting to reach a financial agreement with Berman is immaterial, as the evidence is clear that it was not used for this purpose but instead was used by [Kahn] for his own financial benefit in facilitating his representation of former Berman clients."

*Id.* at 676, 431 A.2d at 1348. The *Kahn* hearing judge concluded that Kahn had engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation; conduct that is prejudicial to the administration of justice; and conduct that adversely reflects on his fitness to practice law. *Id.* We agreed. *Id.* at 679, 431 A.2d at 1349. Although the hearing judge in the case *sub judice* found *Kahn* to be distinguishable, as we do in *some* respects, *Kahn* nonetheless stands for the proposition that it is unethical and illegal for a lawyer to take information from client files without the consent of the law firm.

The hearing court in the case *sub judice* dismissed the out-of-state cases relied upon by Bar Counsel as distinguishable and not relevant. Although the attorney's conduct in *In the Matter of Cupples,* 952 S.W.2d 226 (Mo.1997), and *In re Smith,* 315 Or. 260, 843 P.2d 449 (1992), was more egregious than that of respondent in the instant case, Bar Counsel is correct that those cases support its contention that removal of client files under the circumstances in which respondent acted was unethical.

In the attorney disciplinary action, *In the Matter of Cupples,* 952 S.W.2d 226 (Mo.1997), the Missouri Supreme Court held that the attorney, Cupples, violated Missouri Rule 4–8.4(c) by secreting client litigation files from his partners in preparation to withdraw from the law firm and by removing client litigation files from the firm without the appropriate consent of his partners or the client. Even though the Missouri court found that all of the attorney's conduct was for the purpose of deceiving and defrauding his partners with the intent to appropriate the business for himself, *id.* at 230–31, and in the instant case, respondent's motive may not have been to "deceive and defraud, but to protect the clients," the Missouri Supreme Court was clear that Cupples violated ethical rules by taking the client files. The motive of the lawyer was not central to the finding of a violation of the ethical rules.

The court noted that the problems that occurred when the attorney decided to leave the law firm were symptomatic of a growing trend in the legal profession—that of partners becoming increasingly mobile and feeling much freer to shift from one firm to another. *Id.* at 233. When partners and associates leave law firms, the issue of the continued representation of the client inevitably arises. The Missouri court cogently pointed out that clients are not the property of the lawyer. The court addressed the duty of a lawyer to a client as follows:

"The client has the right to choose the attorney or attorneys who will represent it. *Rule 4–1.16(a)(3) (1997); see also Model Code,* DR 2–110(B)(4). '[C]lients are not the "possession" of anyone, but, to the contrary, control who represent them.' *Kelly v. Smith,* 611 N.E.2d 118, 122 (Ind.1993). 'Clients are not merchandise. They cannot be bought, sold, or traded. The attorney-client relationship is personal and confidential, and the client's choice of attorneys in civil cases is near absolute.' *Koehler v. Wales,* 16 Wash.App. 304, 556 P.2d 233, 236 (1976); *see also Ellerby v. Spiezer,* 138 Ill.App.3d 77, 92 Ill.Dec. 602, 605, 485 N.E.2d 413, 416 (1985); *Resnick v. Kaplan,* 49 Md.App. 499, 434 A.2d 582, 588 (1981); *Corti,* supra; HENRY S. DRINKER, LEGAL ETHICS 211 (1953); HILLMAN, *supra,* sec. 2.3.1.1; HAZARD & HODES, *supra,* sec. 7.3:202, at 885. The client's files belong to the client, not to the attorney representing the client. The client may direct an attorney or firm to transmit the file to newly retained counsel. *In re Grand Jury Proceedings,* 727 F.2d 941, 944 (10th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984); *Rose v. State Bar of Cal.,* 49 Cal.3d 646, 262 Cal.Rptr. 702, 706, 779 P.2d 761, 765 (1989); HILLMAN, *supra,* sec. 2.3.2.1. Finally, an attorney representing a client has a duty to communicate with the client regarding the client's representation. *Rule 4–1.4(b)(1997); see also Model Code,* EC 9–2. This duty includes communicating with the client about material changes in who represents the client. *See Rule 4–1.16(d) (1997); Rule 4* (Preamble); *Vollgraff v. Block,* 117 Misc.2d 489, 458 N.Y.S.2d 437, 440 (1982); Judy R. May,

*Comment: In Search of Greener Pastures: Do Solicitation Rules and Other Ethical Restrictions Governing Departing Partners Really Make Sense Today?*, 40 VILL. L. REV. 1517, 1528 (1995)."

*Id.* at 234. The court found that Cupples breached duties owed by him to the client by failing to inform the client of the material change in representation and failing to obtain the client's informed consent as to how it wished its work to be handled. *Id.* at 235. The court also found that Cupples, as a partner in the firm, breached fiduciary duties owed by him to the law firm. *Id.* at 237. He violated these duties by hiding client files from the firm and failing to inform the firm of the legal work he was handling for the client. *Id.* The court explained as follows:

> "The withdrawing attorney and the firm also have a duty to orderly maintain or transfer the clients' files in accordance with the clients' directions and to withdraw from representing those clients by whom they are discharged. Both the withdrawing attorney and the firm have a mutual duty, not only to the client, but to each other as well, to make certain that these tasks are completed in a competent and professional manner to the reasonable satisfaction of their clients."

*Id.* at 236–37. This duty of the withdrawing partner to the firm is not limited to the partner; the withdrawing associate has a like duty. *Id.* at 236. Cupples' actions violated the rule of professional conduct prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation. *Id.* at 237.

In *In re Smith*, 315 Or. 260, 843 P.2d 449 (1992), the attorney, Smith, engaged in similar conduct. During the two and one-half months preceding his departure from the firm, Smith, who was an employee associate of the firm, met with thirty-one clients and had them sign individual retainer agreements rather than firm retainer agreements. The Oregon Supreme Court, agreeing with the disciplinary hearing panel, concluded that the attorney's conduct involved dishonesty, fraud, deceit, or misrepresentation as prohibited by DR 1–102(A)(3) in that "before the 31 new clients signed the individ-

ual retainer agreements, the [lawyer] anticipated leaving [the law firm]; that he intended to keep these clients as his own if and when he left [the firm]; and that he therefore consciously kept the 31 new clients out of the [firm's] file system." *Id.* at 451. When Smith left the firm, he took the files of these thirty-one clients as well as files relating to fifty to seventy-five other cases. The court held that Smith's dishonesty, deceit, and misrepresentation violated a duty to his clients, the public and his former law firm. *Id.* The court imposed a suspension from the practice of law for four months, reasoning that

> "[T]he real and potential harm to the public is great when lawyers attempt to take economic rights from their own firms (as did the accused here): A breach of integrity like this one merits a severe sanction. *See* ABA Standard 1.1 ('The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession.')."

*Id.* at 452.

The American Bar Association, in Informal Ethics Opinion C 787, addressed the question, *inter alia,* of whether a salaried attorney who decides to leave the law firm and plans to become associated with another attorney may, without the knowledge of the partners of the firm, remove from the law office the files upon which he has been working. ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. C–787 (1964). The Committee on Ethics responded with a resounding "NO." The opinion concluded that "the acts of the attorney employed by the partnership in removing the files upon which he had been working from the offices of the partnership without the knowledge of the partners would be highly improper, unethical and a violation of his obligation to his former employers." Commenting on the hypothetical scenario in which the client might have had knowledge that the attorney was removing the files, the Committee opined that "this would not excuse the attorney's conduct." The Committee on Ethics and Professional Responsibility of the Idaho State Bar ex-

pressed the same view in Formal Opinion No. 108, dated August 28, 1981. Addressing the broader question of the propriety of covenants not to compete between attorneys, the Committee concluded "[o]f course, when the associate leaves the association's employ, he cannot take with him client files which are the property of the association." *See also* Michigan State Bar Comm. on Prof'l and Judicial Ethics, Informal Op. CI–681 (1981) (Superceded by RI–49 1990) (citing ABA Informal Opinion C–787 and stating that a withdrawing associate or partner may not take client files before the clients have discharged the firm and retained the lawyer even if the lawyer fears that the firm will refuse to turn over the files).

Respondent has committed acts that reflect adversely on his honesty and trustworthiness as a lawyer; he engaged in conduct involving dishonesty or deceit; and he engaged in conduct that is prejudicial to the administration of justice. Respondent has violated Rules 8.4(b), (c) and (d).

### III.

■ We now turn to the appropriate sanction to be imposed. Bar Counsel recommends that respondent be suspended indefinitely from the practice of law with the right to apply for reinstatement in one year.

■ The purpose of sanctioning an attorney is to protect the public rather than to punish the errant attorney. *See Attorney Grievance Comm'n v. Powell*, 369 Md. 462, 474, 800 A.2d 782, 789 (2002). Attorney disciplinary proceedings also are aimed at deterring other attorneys from committing violations of the Rules of Professional Conduct. *Id.* at 474–75, 800 A.2d at 789. The severity of the sanction depends on the particular facts and circumstances of each case, including consideration of any mitigating factors or aggravating factors. *See Attorney Grievance Comm'n v. Angst*, 369 Md. 404, 416–18, 800 A.2d 747, 755 (2002). On occasion, in considering the appropriate sanction to be imposed, we have referred to the ABA Standards for Imposing Lawyer Sanctions. *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 453–54, 836 A.2d

605, 622 (2003); *Attorney Grievance Comm'n v. West,* 378 Md. 395, 411, 836 A.2d 588, 597 (2003); *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 88, 803 A.2d 505, 511 (2002); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 484, 671 A.2d 463, 480 (1996). The Standards set out a framework for consideration of discipline matters, providing as follows:

(1) What ethical duty did the lawyer violate?

(2) What was the lawyer's mental state?

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?

(4) Are there any aggravating or mitigating circumstances? [6]

*See* ABA Standards for Imposing Lawyer Sanctions, *reprinted in ABA Compendium of Professional Responsibility Rules and Standards,* 338–39, 344 (1999).

By deleting computer records, respondent committed criminal acts. Because he knew that he lacked the authority to take the client files and delete the computer records, respondent acted intentionally and dishonestly. Although respondent knew that his actions were improper and illegal, he acted in an effort to facilitate his representation of the two clients and the hearing judge found that he had the clients' best interests in mind. The hearing judge found as follows:

"[Respondent] believed that if he did not take possession of the files relating to the Caldart and Kazmar matters, Mr. Weitzman would withhold the files or take other action, thereby impairing the Respondent's ability to represent the clients and otherwise impede the progress of the clients' cases. [Respondent] anticipated that Mr. Weitzman would forcibly retain possession of the clients' files in order to

---

**6.** ABA Standard 9.21 defines "Aggravation" as "any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.31 defines "Mitigation" as "any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standards for Imposing Lawyer Sanctions, *reprinted in ABA Compendium of Professional Responsibility Rules and Standards* 352–53 (1999).

obtain a financial share from the proceeds of any recovery in excess of the amount of any *quantum meruit* to which Mr. Weitzman might be entitled."

We thus consider, for the purpose of a sanction, that respondent acted in what he believed to be the clients' best interests. The hearing judge also found that respondent did not solicit any of the clients of the firm before he resigned from the firm. He also found that respondent had "every reason to believe that both the Caldart and Kazmar clients would elect to have him continue his representation if he left [the firm]."

There is no evidence in the record that the clients actually were harmed by respondent's conduct. This does not mean that respondent's misconduct did not breed any negative consequences, however. We must consider the harm to respondent's former employer and to the public.

Respondent's conduct created the potential that Mr. Weitzman could suffer harm in the future. Mr. Weitzman had a policy of keeping client files for at least five years after the representation had ended. Respondent's unauthorized appropriation of the files and deletion of the computer records prevented Mr. Weitzman from adhering to this practice. Although respondent brought the Caldart and Kazmar clients to the firm and provided legal services for them, they were clients of the firm for two years and one year, respectively. If the clients ever filed a malpractice suit against the firm, Mr. Weitzman would have no documentation to aid in his defense of the suit. Thus, Mr. Weitzman potentially was harmed by not possessing any files or computer records relating to these two client matters.

Mr. Weitzman was harmed because respondent's taking of the paper files extinguished whatever ability Mr. Weitzman might have had to exercise a retaining lien on those files in order to secure any payment to which he may have been entitled. *See* Rule 2–652(a) (Retaining lien); [7] *Attorney Griev-*

---

7. Rule 2–652(a) provides as follows:

*ance Comm'n v. Sheridan,* 357 Md. 1, 31, 741 A.2d 1143, 1159 (1999). A retaining lien depends upon the attorney having possession of the client's papers. *Id.;* C. Wolfram, *Modern Legal Ethics,* § 9.6.3, Attorney Liens, at 560 (1986) (stating that "[t]he retaining lien is enforceable only by possession").

Next, we consider several mitigating factors. Respondent has no prior disciplinary record and has been a member of the Maryland Bar in good standing for thirteen years. Respondent's actions appear to be an isolated incident, or at least do not constitute a pattern or course of conduct. Before respondent became employed with Mr. Weitzman's firm in 1997, Mr. Weitzman employed respondent for five years as an independent contractor to work on some of Mr. Weitzman's cases. There are no allegations that respondent acted improperly from 1992 until 2001, when respondent engaged in the conduct that is the subject of this grievance proceeding. Finally, we accept the hearing judge's determination that respondent's underlying motive was "to represent competently the clients, not to be dishonest or deceitful."

A primary purpose of sanctions is to protect the public. We have stated that "[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Thus, the appropriate sanction depends upon the facts and circumstances of each particular case, including consideration of aggravating and any mitigating factors. *See Attorney Grievance Comm'n v. Atkinson,* 357 Md. 646, 656, 745 A.2d 1086, 1092 (2000).

Respondent has violated Rules 8.4(b), (c), and (d). Notwithstanding the attorney's motive, lawyers in this State may not delete computer records or take client files from the law firm

---

"Except as otherwise provided by the Maryland Rules of Professional Conduct, an attorney who has a common-law retaining lien for legal services rendered to a client may assert the lien by retaining the papers of the client in the possession of the attorney until the attorney's claim is satisfied."

without authorization. After consideration of all the circumstances presented herein, we conclude that respondent's misconduct was sufficiently serious to warrant a suspension from the practice of law for a period of ninety days, said suspension to commence thirty (30) days from the date of entry of this Opinion and Order.

*IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761(B), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STEVEN JOHN POTTER.*